# IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF MISSOURI
### WESTERN DIVISION

| | |
|---|---|
| **RICHARD MITCHELL,** ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | |
| ) | Case No. 4:23-CV-00138-GAF |
| **THE DIEZ GROUP, LLC** ) | |
| **d/b/a DIEZ GROUP,** ) | Hon. Gary A. Fenner |
| ) | |
| and ) | |
| ) | |
| **THE DIEZ GROUP KANSAS CITY,** ) | |
| **LLC d/b/a DELACO STEEL KANSAS** ) | |
| **CITY,** ) | |
| ) | |
| Defendants. ) | |

## DEFENDANTS' SUGGESTIONS IN SUPPORT OF
## THEIR MOTION FOR SUMMARY JUDGMENT

# Table of Contents

Table of Authorities .................................................................................................. ii

Introduction ............................................................................................................. 1

Statement of Uncontroverted Material Facts ........................................................... 2

I.      Mitchell is hired by Diez and trained on company policies.................................. 2

II.     Mitchell's poor performance and attendance falls short of Diez's expectations. .............. 3

III.    Mitchell strains his shoulder at work. .................................................................... 5

IV.     Diez terminates Mitchell's employment. ............................................................... 8

V.      Diez pays workers' compensation benefits to Mitchell. ........................................ 8

Standard of Review ................................................................................................... 9

Argument .................................................................................................................. 9

I.      All of Mitchell's disability discrimination and failure to accommodate claims
        (Counts II-III and V-VII) fail at the threshold because he was not disabled. .................... 9

        A.      Mitchell was not disabled. .................................................................... 10

        B.      Mitchell does not have a record of being disabled. ............................... 11

        C.      Mitchell was not regarded as disabled. ................................................. 11

II.     Mitchell cannot prove he was terminated due to his alleged disability (Counts II
        and V)..................................................................................................................... 12

        A.      Diez had legitimate, nondiscriminatory reasons to terminate
                Mitchell. ............................................................................................... 12

        B.      Mitchell cannot show that the concerns motivating his termination
                are false and pretext for disability discrimination................................. 13

III.    Mitchell's failure to accommodate claims (Counts III and VII) also fail because,
        even though he never requested accommodation, he was accommodated. ........... 16

IV.     Mitchell's retaliatory termination claims (Counts I and IV) fail for the same
        reasons as the disability termination claims........................................................ 18

Conclusion ................................................................................................................ 20

# Table of Authorities

**Cases**

*Anderson v. Liberty Lobby, Inc.*,
477 U.S. 242 (1986)..................................................................................... 9

*Ashby v. Woodridge of Mo., Inc.*,
673 S.W.3d 537 (Mo. Ct. App. 2023)................................................... 18, 19

*Ballard v. Rubin,*
284 F.3d 957 (8th Cir. 2002) ............................................................... 16

*Bevill v. Home Depot U.S.A., Inc.*,
753 F. Supp. 2d 816 (S.D. Iowa 2009) ................................................. 18

*Bingham v. Union Pac. R.R. Co.*,
2023 WL 6196875 (D. Neb. Sept. 22, 2023) ......................................... 11

*Bright v. Evonik Cyro, LLC,*
2013 WL 2395264 (E.D. Ark. May 30, 2013)....................................... 17

*Celotex Corp. v. Catrett,*
477 U.S. 317 (1986)............................................................................. 9

*Clark v. YRC Freight*,
2016 WL 918047 (W.D. Mo. Mar. 8, 2016)........................................ 10

*Cook v. Atoma Int'l of Am., Inc.,*
930 S.W.2d 43 (Mo. Ct. App. 1996).................................................... 12

*Corkrean v. Drake Univ.*,
55 F.4th 623 (8th Cir. 2022) ........................................................... 15, 16

*Daugherty v. City of Md. Heights*,
231 S.W.3d 814 (Mo. 2007) ............................................................. 16

*Davis v. Sixteenth Judicial Circuit Court*,
2018 WL 10096428 (W.D. Mo. Jan. 9, 2018) ..................................... 10

*Diallo v. Catalent Pharma Sols., LLC*,
2020 WL 3105095 (W.D. Mo. June 11, 2020) ..................................... 16

*E.E.O.C. v. Prod. Fabricators, Inc.*,
2013 WL 1104731 (D. Minn. Mar. 18, 2013) ......................... 17, 19, 20

*Evance v. Trumann Health Servs., LLC*,
719 F.3d 673 (8th Cir. 2013) ............................................................. 12

Case 4:23-cv-00138-GAF   Document 36-1   Filed 01/15/24   Page 3 of 26

*Henthorn v. Capitol Commc'ns, Inc.*,
    359 F.3d 1021 (8th Cir. 2004) .............................................................. 13

*Holston v. City of Hope, Ark.*,
    2020 WL 60246 (W.D. Ark. Jan. 6, 2020) ............................................. 13

*Irving v. Dierbergs Market, Inc.*,
    2023 WL 2536363 (E.D. Mo. Mar. 16, 2023) ........................................ 10

*Jackson v. Gen. Motors, LLC*,
    2020 WL 3469334 (E.D. Mo. June 25, 2020) .................................... 17, 19

*Jackson v. St. Joseph State Hosp.*,
    840 F.2d 1387 (8th Cir. 1988) .............................................................. 17

*Jackson v. Union Pac. R.R. Co.*,
    2021 WL 1726895 (S.D. Iowa Mar. 29, 2021) ...................................... 10

*Kiel v. Select Artificials, Inc.*,
    169 F.3d 1131 (8th Cir. 1999) .............................................................. 17

*Larsen v. Maynard, Inc.*,
    2019 WL 2774329 (W.D. Ark. July 2, 2019) ........................................ 18

*Lovelace v. Washington Univ. Sch. of Med.*,
    931 F.3d 698 (8th Cir. 2019) ................................................................ 10

*Magnussen v. Casey's Mktg. Co.*,
    787 F. Supp. 2d 929 (N.D. Iowa 2011) ................................................. 20

*Mancini v. City of Providence*,
    909 F.3d 32  (1st Cir. 2018) .................................................................. 11

*Mathews v. Trilogy Commc'ns, Inc.*,
    143 F.3d 1160 (8th Cir. 1998) .............................................................. 13

*McDonnell Douglas Corp. v. Green*,
    411 U.S. 792 (1973) ............................................................................. 12

*Mobley v. St. Luke's Health Sys., Inc.*,
    53 F.4th 452 (8th Cir. 2022) ................................................................ 16

*Oehmke v. Medtronic, Inc.*,
    844 F.3d 748 (8th Cir. 2016) ................................................... 10, 12, 18

*Rogers v. Entergy Ark., Inc.*,
    2008 WL 4368637 (E.D. Ark. Sept. 19, 2008) ..................................... 19

- iii -

*Schaffhauser v. United Parcel Serv., Inc.*,
794 F.3d 899 (8th Cir. 2015) ............................................................. 13

*Schierhoff v. GlaxoSmithKline Consumer Healthcare, L.P.*,
444 F.3d 961 (8th Cir. 2006) ............................................................. 12

*Scroggins v. Univ. of Minn.*,
221 F.3d 1042 (8th Cir. 2000) ........................................................... 20

*Smith v. Allen Health Sys., Inc.*,
302 F.3d 827 (8th Cir. 2002) ............................................................. 16

*Sprenger v. Fed. Home Loan Bank of Des Moines*,
253 F.3d 1106 (8th Cir. 2001) ...................................................... 15, 16

*St. Lawrence v. Trans World Airlines, Inc.*,
8 S.W.3d 143 (Mo. Ct. App. 1999) ..................................................... 20

*Twymon v. Wells Fargo & Co.*,
462 F.3d 925 (8th Cir. 2006) ............................................................. 13

*Univ. of Tex. Sw. Med. Ctr. v. Nassar*,
570 U.S. 338 (2013) ......................................................................... 18

*Walz v. Ameriprise Fin., Inc.*,
779 F.3d 842 (8th Cir. 2015) ............................................................. 16

*Wierman v. Casey's Gen. Stores*,
638 F.3d 984 (8th Cir. 2011) ............................................................. 15

*Wiley v. Ozarks Med. Ctr.*,
2009 WL 4114387 (W.D. Mo. Nov. 24, 2009) .................................... 11

*Winters v. Deere & Co.*,
63 F.4th 685 (8th Cir. 2023) ............................................................. 13

*Withers v. Johnson*,
763 F.3d 998 (8th Cir. 2014) ....................................................... 16, 19

**Statutes**

42 U.S.C. § 12102 ............................................................................ 10, 11

42 U.S.C. § 12112 ................................................................................... 10

Mo. Rev. Stat. § 213.010 .......................................................................... 10

Mo. Rev. Stat. § 213.055 .......................................................................... 10

- iv -

**Rules**

Fed. R. Civ. P. 56.................................................................................................... 9

**Regulations**

29 C.F.R. § 1630.2 ............................................................................................... 11

Mo. Code Regs. Ann. tit. 8, § 60-3.060 .............................................................. 10, 11

**Introduction**

Defendant The Diez Group Kansas City, LLC ("Diez")[1] hired Plaintiff Richard Mitchell on March 28, 2022 as a Maintenance Technician. New Diez employees are subject to a 90-day "introductory" period so that supervisors may gauge performance and attendance, among other things. It quickly became apparent that Mitchell lacked the basic skills required for the position, requiring his direct supervisor Ryan Vestal to give performance coaching only a few weeks into the job. Mitchell was then tested on his skills and—despite using his phone to cheat on the test—scored only 43%. Employees in their introductory period are only allowed two absences, and Mitchell hit that limit less than a month in. Based on Mitchell's performance and attendance issues, Vestal recommended to the plant manager that Mitchell be terminated.

Before Vestal's recommendation was acted on, Mitchell told Diez he had been injured on the job. Diez sent him to a medical clinic, which diagnosed a right shoulder strain and issued restrictions that temporarily prevented him from working. When asked about the injury, Mitchell offered shifting explanations about when the injury occurred—stating first that it had been a "few weeks" earlier, then stating it was "recent," then stating it had happened on the prior shift. In any event, he admitted that he had not reported the injury by the end of the shift on which it occurred, contrary to company policy. This latest violation of company policy was the final straw, ending with Mitchell's termination due to his poor performance, inconsistent attendance, and violation of the injury reporting policy. Even so, Diez's workers' compensation insurer paid Mitchell until he was released from his medical restrictions a few weeks later on June 9, 2022.

Mitchell now claims disability discrimination and workers' compensation retaliation. But these claims have no merit. For one thing, a temporary shoulder strain lasting a few weeks is not

---

[1] Defendant The Diez Group, LLC is the parent company of The Diez Group Kansas City, LLC.

a "disability" under federal or state law, requiring dismissal of those claims at the threshold. Nor can Mitchell use his workers' compensation claim to ward off the performance- and attendance-based termination that was already in the works. Ultimately, Mitchell was not terminated because of his workers' compensation claim. He was terminated because he could not do the job he was hired to do, and because he refused to follow policy despite knowing he was in a probationary period. The Court should grant summary judgment on all claims.

## Statement of Uncontroverted Material Facts

**I.    Mitchell is hired by Diez and trained on company policies.**

1.    Diez prepares, stores, and sells aluminum and steel parts from six facilities across the eastern half of the United States. (*About us – The Diez Group*, https://thediezgroup.com/about-us-2/ (last visited January 11, 2024).)

2.    Its Kansas City plant specializes in punching shapes out of steel sheet metal. (Ex. A, Vestal Dep. 6:11-25.)

3.    In March 2022, Diez hired Mitchell as a Maintenance Technician at its Kansas City plant. (Ex. B, Mitchell Dep. Ex. 2; *see also* Ex. C, Mitchell Dep. 20:14-16.)

4.    Before Mitchell started at Diez, he received training on the Company's policies, including those contained in the Employee Manual. (Ex. C, Mitchell Dep. 20:9-13; Ex. D, Mitchell Dep. Exs. 3 & 4; *see also* Ex. E, Melvin Dep. 8:20-9:24.)

5.    The Employee Manual explains that all new hires at Diez must complete a 90-day "Introductory Period" which is intended "to allow management sufficient time to evaluate the employee's work habits, attendance and attitude, as well as his/her ability to meet work requirements and follow safety rules." (Ex. D, Mitchell Dep. Ex. 3 at 12.)

6. During the Introductory Period, employees are permitted up to two absences; employees with three absences may be terminated. (*Id.* at 41.)

7. The Employee Manual outlines procedures for reporting work-related injuries. (*Id.* at 22.)

8. Diez employees are required to report any injuries to their supervisors or Human Resources immediately or, at the latest, by the end of their shift. (*Id.*)

9. Failure to do so can lead to discipline, up to and including dismissal. (*Id.*; *see also id.* at 46.)

## II. Mitchell's poor performance and attendance falls short of Diez's expectations.

10. Mitchell began working at Diez on March 28, 2022. (Ex. C, Mitchell Dep. 20:14-16.)

11. He reported to Maintenance Manager Ryan Vestal who, in turn, reported to Plant Manager Matt Hunt. (Ex. C, Mitchell Dep. 19:21-23; Ex. A, Vestal Dep. 6:2-5, 25:13-14.)

12. As a Maintenance Technician, Mitchell was responsible for adjusting and repairing both the manufacturing equipment and facilities at the Kansas City plant. (Ex. F, Mitchell Dep. Ex. 7.)

13. After observing Mitchell's performance, Vestal believed that Mitchell lacked basic maintenance skills and struggled to complete the work he was assigned. (Ex. A, Vestal Dep. 11:19-12:21, 15:7-19, 16:17-22.)

14. In one instance, Vestal asked Mitchell to re-run air lines, a task that Vestal considered to be easy and straightforward. (*Id.* at 17:1-3.)

15. Mitchell was unable to complete the job and Vestal ended up finishing it himself. (*Id.* at 17:4-6.)

16.     On another occasion, Vestal instructed Mitchell to run sticks of electrical conduit and tapped two of Mitchell's colleagues to train him on how to do it. (Ex. G, Vestal Dep. Ex. 2; *see also* Ex. A, Vestal Dep. 12:4-6.)

17.     It took Mitchell his entire ten-hour shift to install two sticks of conduit, a task that Vestal estimated could have been completed by a competent technician in less than 30 minutes. (Ex. G, Vestal Dep. Ex. 2; Ex. A, Vestal Dep. 29:16-18.)

18.     Mitchell could communicate via phone and text message with both Vestal and Human Resources Generalist Sharon Melvin. (Ex. C, Mitchell Dep. 77:7-10; Ex. A, Vestal Dep. 30:22-31:5, 48:22-49:8; Ex. E, Melvin Dep. 5:17-19; *see also* Ex. G, Vestal Dep. Ex. 2 (noting that Mitchell had texted Vestal about a certification).)

19.     However, Mitchell sometimes failed to communicate with Vestal and would instead send details about his progress to Melvin. (Ex. A, Vestal Dep. 26:12-20; Ex. H, Vestal Dep. Ex. 1.)

20.     Vestal took several steps to address Mitchell's performance issues. (*See infra* ¶¶ 21-23.)

21.     He asked the other Maintenance Technicians to show him how to complete maintenance tasks. (Ex. A, Vestal Dep. 12:22-13:2; Ex. G, Vestal Dep. Ex. 2.)

22.     Mitchell, Vestal, Melvin, and Hunt met to discuss Vestal's feedback on April 19, 2022. (Ex. H, Vestal Dep. Ex 1; Ex. A, Vestal Dep. 24:1-14.)

23.     When Mitchell's performance still did not improve, Vestal administered a written exam to gauge Mitchell's knowledge about basic maintenance procedures. (Ex. A, Vestal Dep. 46:3-15.)

24.     Although Melvin saw Mitchell looking up answers on his phone during the test, Mitchell scored 43% on it. (Ex. E, Melvin Dep. 21:10-18; Ex. I, Melvin Decl. Ex. 1.)

25.     Just two days after he started at Diez, Mitchell was absent from work. (Ex. J, Mitchell Dep. Ex. 5; *see also* Ex. C, Mitchell Dep. 30:16-18.)

26.     On April 23, 2022 – less than a month after he was hired – Mitchell did not show up for his shift or call in his absence. (Ex. J, Mitchell Dep. Ex. 5.)

27.     As a result, Mitchell received a written attendance warning. (*Id*.)

28.     Based on Mitchell's consistent history of poor performance and attendance, Vestal spoke with Hunt and recommended that Mitchell be terminated. (Ex. A, Vestal Dep. 47:1-17.)

29.     Vestal made this recommendation before Mitchell reported his work-related injury. (*Id.* at 47:10-12.)

## III.     Mitchell strains his shoulder at work.

30.     According to Mitchell, he strained his right shoulder while unwrapping coils of sheet metal during his shift on May 18, 2022. (Ex. C, Mitchell Dep. 32:18-20, 35:22-36:12.)

31.     He did not report his injury to anyone at Diez before his shift ended. (*Id.* at 36:22-37:4, 38:24-39:4.)

32.     Instead, on May 19, 2022, he told Melvin that he had been injured on the job. (*Id.* at 31:17-20, 37:3-6, 38:24-39:7.)

33.     Melvin instructed Mitchell to come to the plant to pick up a form authorizing him to seek medical attention at the Company's occupational healthcare provider, Concentra. (*Id.* at 31:17-32:1, 37:7-12, 39:22-25; Ex. E, Melvin Dep. 25:11-17; Ex. K, Melvin Decl. ¶ 5.)

34.     When Mitchell arrived at the office, Melvin asked him to elaborate on the circumstances of his injury so she could complete an internal incident report. (Ex. E, Melvin Dep. 26:12-28:2.)

35.     Melvin asked Mitchell when he had been injured. (*Id*. at 28:13-15.)

36.     Melvin recalls (and her contemporaneous notes reflect) that Mitchell first told her that he had hurt his shoulder "a few weeks ago." (*Id.* at 28:16-25; Ex. L, Melvin Dep. Ex. 6 (Melvin's handwritten notes of her conversation with Mitchell: "What time? Not sure. 2-3 weeks ago").)

37.     Melvin clarified by asking "A few weeks ago?" and Mitchell responded "[W]ell, it was recently." (Ex. E, Melvin Dep. 28:16-19.)

38.     Melvin then reminded Mitchell about the Company's policy on timely injury reports. (*Id.* at 29:7-11.)

39.     At that point, Mitchell told Melvin that he had strained his shoulder the night before, on May 18. (*Id.* at 30:22-25.)

40.     Later that day, a physician's assistant at Concentra diagnosed Mitchell with "cervical strain," "strain of shoulder, right," and "thoracic myofascial strain." (Ex. M, Mitchell Dep. Ex. 6.)

41.     The physician's assistant noted that Mitchell could return to work that same day but could not lift more than 10 pounds, push or pull more than 10 pounds, or reach above his shoulder with his right arm. (*Id.*).

42.     The Maintenance Technician position involved frequent lifting of items weighing over 50 pounds. (Ex. F, Mitchell Dep. Ex. 7 at 2.)

43.     Mitchell was thus unable to perform his regular job duties. (Ex. C, Mitchell Dep. 41:5-8, 41:24-42:5, 60:17-21.)

44.     At the time, Diez did not have any open positions that complied with Mitchell's restrictions. (*Id.* at 60:12-14; Ex. A, Vestal Dep. 35:20-23; Ex. E, Melvin Dep. 35:3-15.)

45.     As of May 19, 2022, Mitchell was placed on a leave of absence pending the removal of his movement restrictions. (Ex. C, Mitchell Dep. 63:23-25.)

46.     Melvin told Mitchell to follow up with his treatments at Concentra. (*Id.* at 42:6-10, 63:20-22.)

47.     Over the coming days, Mitchell attended several follow-up appointments at the Concentra clinic and received physical therapy for his shoulder. (*Id.* at 45:22-46:7; Ex. N, Melvin Decl. Ex. 5.)

48.     At his deposition, Mitchell testified that he never requested an accommodation for his injury. (Ex. C, Mitchell Dep. 61:3-9.)

49.     No manager at Diez ever pressured Mitchell to return to work or violate his medical restrictions. (*See, e.g.*, Ex. A, Vestal Dep. 34:17-19 (Vestal never spoke to Mitchell about his injury); Ex. E, Melvin Dep. 34:20-35:25; Ex. O, Melvin Dep. Ex. 8.)

50.     Nor did anyone at Diez ever make any negative comments about Mitchell's injury. (*See, e.g.*, Ex. C, Mitchell Dep. 63:17-19 (Melvin never made any negative comments about Mitchell's injury); Ex. A, Vestal Dep. 33:10-35:15.)

51.     No one at Diez ever made any negative comments about Mitchell's leave of absence. (*See, e.g.*, Ex. A, Vestal Dep. 33:10-35:15; Ex. O, Melvin Dep. Ex. 8.)

52.     On June 9, 2022, three weeks after he allegedly strained his shoulder, Mitchell was released from medical treatment and authorized to return to work without restriction. (Ex. P, Mitchell Dep. Ex. 8.)

53.     Mitchell did not continue with physical therapy for his shoulder after June 9, 2022. (Ex. C, Mitchell Dep. 46:8-10.)

54. Since June 9, 2022, Mitchell has been able to work without restriction. (*Id.* at 58:2-4.)

## IV. Diez terminates Mitchell's employment.

55. In late May 2022, Hunt decided to dismiss Mitchell. (Ex. A, Vestal Dep. 38:1-4; Ex. Q, Melvin Dep. Ex. 9.)

56. His decision was motivated by three considerations: (1) Mitchell's recurring performance issues and lack of fundamental skills; (2) Mitchell's poor attendance record; and (3) his belief that Mitchell had violated company policy by failing to timely report his injury. (Ex. Q, Melvin Dep. Ex. 9; *see also* Ex. E, Melvin Dep. 57:22-58:7.)

57. Melvin notified Mitchell of his termination via text message on May 24, 2022. (Ex. O, Melvin Dep. Ex. 8.)

58. Mitchell is unaware of any other employees at Diez who failed to immediately report an injury and were not terminated. (Ex. C, Mitchell Dep. 64:1-5.)

59. Mitchell is unaware of any other employees at Diez who were counseled for poor performance, had more than two attendance points, and violated company policy and were not terminated. (*Id.* at 64:6-13.)

## V. Diez pays workers' compensation benefits to Mitchell.

60. Shortly after she learned of Mitchell's injury, Melvin submitted a claim to Diez's workers' compensation insurer, The Chubb Corporation. (Ex. E, Melvin Dep. 38:20-25; Ex. K, Melvin Decl. ¶ 3; Ex. R, Melvin Decl. Ex. 2.)

61. Chubb promptly processed Mitchell's claim. (*See, e.g.*, Ex. R, Melvin Decl. Ex. 2; Ex. S, Melvin Decl. Ex. 3.)

62.     Chubb paid Mitchell $2,319.99—the equivalent of three weeks of wages. (Ex. T, Melvin Decl. Ex. 4; *see also* Ex. C, Mitchell Dep. 49:6-11 (Mitchell received workers' compensation benefits and Diez never challenged his right to receive them).)

63.     No one at Diez ever discouraged Mitchell from seeking workers' compensation benefits for his shoulder strain. (Ex. C, Mitchell Dep. 47:15-18.)

64.     No one at Diez ever made a negative comment about Mitchell's workers' compensation claim to him. (*Id.* at 47:19-21.)

## Standard of Review

Summary judgment is appropriate when there is no genuine dispute of material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). A dispute is only "genuine" "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). To survive summary judgment, Mitchell must "go beyond the pleadings" and "designate 'specific facts showing that there is a genuine issue for trial.'" *Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986) (quoting the contemporary version of Fed. R. Civ. P. 56(e)). Conclusory allegations, speculation, and denials are not sufficient. *Liberty Lobby*, 477 U.S. at 256-57. "If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted." *Id.* at 249-50 (internal citations omitted).

## Argument

### I.     All of Mitchell's disability discrimination and failure to accommodate claims (Counts II-III and V-VII) fail at the threshold because he was not disabled.

The Americans with Disabilities Act ("ADA") protects three classes of individuals: (1) those who suffer from "a physical or mental impairment that substantially limits one or more major life activities"; (2) those who have "a record of such an impairment"; and (3) those who are

"regarded as having such an impairment," subject to an exception discussed below. 42 U.S.C. §§ 12102(1), 12112. The Missouri Human Rights Act's ("MHRA") protections extend to the same three classes. Mo. Rev. Stat. §§ 213.010(5), .055(1). If a plaintiff cannot show he is disabled, his disability discrimination or accommodation claim fails at the threshold. *See, e.g.*, *Oehmke v. Medtronic, Inc*., 844 F.3d 748, 755 (8th Cir. 2016) ("disability" is part of plaintiff's *prima facie* case); *Clark v. YRC Freight*, 2016 WL 918047, at *10 (W.D. Mo. Mar. 8, 2016). Mitchell cannot show he was disabled, so his claims under the ADA and MHRA necessarily fail.

**A. Mitchell was not disabled.** First, Mitchell cannot invoke the ADA or MHRA because a temporary shoulder strain lasting only a few weeks is not a "disability" as defined in either statute. *See, e.g.*, *Davis v. Sixteenth Judicial Circuit Court*, 2018 WL 10096428, at *4 (W.D. Mo. Jan. 9, 2018) (holding that alleged knee injury was not a disability under the ADA or the MHRA) (Fenner, J.); *Irving v. Dierbergs Market, Inc.*, 2023 WL 2536363, at *4 (E.D. Mo. Mar. 16, 2023) (rotator cuff tear and bilateral carpal tunnel were not disabilities when "no medical provider has stated Irving has a permanent lifting restriction"); *Jackson v. Union Pac. R.R. Co*., 2021 WL 1726895, at *13 (S.D. Iowa Mar. 29, 2021) (concluding plaintiff was not disabled when there was no evidence that his "stroke left him with permanent or long-lasting physical or mental deficits"); Mo. Code Regs. Ann. tit. 8, § 60-3.060(1)(B)(1) ("Minor temporary illnesses shall not be considered physical or mental impairments resulting in a disability. Examples of minor temporary illnesses include…broken bones, sprains or colds."); *cf. Lovelace v. Washington Univ. Sch. of Med*., 931 F.3d 698, 708 (8th Cir. 2019) ("'general temporary work restrictions'" are "'insufficient to constitute a disability'") (citation omitted).

Here, Mitchell recovered from his shoulder strain in just three weeks, and he has not pointed to any evidence that it has had a permanent or long-lasting effect on him. (Statement of

Uncontroverted Material Facts ("Facts") ¶¶ 52-54.) Indeed, Mitchell did not continue with physical therapy for his shoulder after June 9, 2022, and he is able to work without restriction. (*Id.* ¶¶ 53-54.) Thus, his minor, fleeting shoulder injury that resulted in a lifting restriction for a few weeks is not, as a matter of law, a disability.

**B.  Mitchell does not have a record of being disabled.**  Mitchell's complaint also claims, without elaboration, that he had a record of being disabled. (*See, e.g.*, Compl. ¶ 48, ECF No. 1.) He did not. This category protects an individual who "has a history of an impairment that substantially limited one or more major life activities" or "was misclassified as having had such an impairment." 29 C.F.R. § 1630.2(k)(1); *see also* Mo. Code Regs. Ann. tit. 8, § 60-3.060(1)(D) (similar definition). This prong may be "'satisfied by a showing that the plaintiff had a disability in the past (even though he no longer suffered from that disability when the alleged discriminatory action took place).'" *Bingham v. Union Pac. R.R. Co.*, 2023 WL 6196875, at *9 (D. Neb. Sept. 22, 2023) (quoting *Mancini v. City of Providence*, 909 F.3d 32, 40 (1st Cir. 2018)). But Mitchell has not alleged that he was disabled prior to May 2022 (*see generally* Compl., ECF No. 1), nor does he have any evidence suggesting that Diez previously misclassified him as being disabled. He cannot argue that he is protected as a person with a record of a disability.

**C. Mitchell was not regarded as disabled.**  Mitchell also alleges, again without elaboration, that he was regarded as disabled. (*See, e.g.*, Compl. ¶ 48, ECF No. 1.) But under both the ADA and MHRA, a person is not regarded as having a disability if the impairment is only temporary and does not permanently limit his or her abilities. 42 U.S.C. § 12102(1)(E), (3)(B) (a person is not regarded as having a qualifying impairment when the impairment has an "actual or expected duration of 6 months or less"); *Wiley v. Ozarks Med. Ctr.,* 2009 WL 4114387, at *3 (W.D. Mo. Nov. 24, 2009) ("The undisputed evidence shows that…[plaintiff's manager] only

perceived Wiley's impairment as temporary, and a temporary impairment does not qualify as a disability under the MHRA or the ADA."); *Cook v. Atoma Int'l of Am., Inc.,* 930 S.W.2d 43, 46-47 (Mo. Ct. App. 1996) (holding "regarded as" claim cannot succeed if it is related to temporary injuries). Thus, for the same reasons Mitchell is not disabled—temporary injuries do not count—he cannot make out a "regarded as" disabled claim.

## II. Mitchell cannot prove he was terminated due to his alleged disability (Counts II and V).

Putting aside the fact that Mitchell was not disabled and thus cannot assert disability discrimination, Mitchell's discrimination claims also fail for a lack of proof. When—as here—there is no direct evidence of disability discrimination,[2] both ADA and MHRA claims are evaluated under the familiar *McDonnell Douglas* burden-shifting standard. *Oehmke*, 844 F.3d at 755; *Schierhoff v. GlaxoSmithKline Consumer Healthcare, L.P.*, 444 F.3d 961, 964 (8th Cir. 2006). Under the framework, the employee must first make out a *prima facie* case of discrimination. *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802 (1973). If he does so, the burden shifts to the employer to articulate a legitimate, nondiscriminatory reason for the adverse action. *Id.* Once that is done, the burden shifts back to the employee to prove that the employer's rationale is a pretext for discrimination. *Id.* at 804. Here, even assuming Mitchell could establish a *prima facie* case of disability discrimination, he cannot show that Diez's legitimate, nondiscriminatory reasons for terminating him were pretext for disability discrimination.

**A. Diez had legitimate, nondiscriminatory reasons to terminate Mitchell.** As discussed above, Mitchell's termination was motivated by a combination of three concerns: (1) his

---

[2] Mitchell cannot point to any comments tying his termination to his alleged disability. (*Cf.* Facts ¶ 50.) He thus has no direct evidence of discrimination. *See, e.g., Evance v. Trumann Health Servs., LLC*, 719 F.3d 673, 677 (8th Cir. 2013) ("direct evidence of discrimination" shows "a specific link between the alleged discriminatory animus and the challenged decision") (cleaned up).

poor performance and lack of knowledge as to relevant job skills during his probationary period; (2) his attendance problems during the same period; and (3) his failure to comply with Diez policy for reporting injuries. (Facts ¶ 56.) All these are legitimate, nondiscriminatory reasons why an employer might terminate an employee. *See, e.g.*, *Henthorn v. Capitol Commc'ns, Inc.,* 359 F.3d 1021, 1028-29 (8th Cir. 2004) (poor performance was legitimate, non-pretextual reason for employment action); *Winters v. Deere & Co.*, 63 F.4th 685, 690 (8th Cir. 2023) (history of performance and attendance issues were legitimate, nondiscriminatory reasons for termination); *Twymon v. Wells Fargo & Co.*, 462 F.3d 925, 935 (8th Cir. 2006) ("We have consistently held that violating a company policy is a legitimate, non-discriminatory rationale for terminating an employee.").

> **B.      Mitchell cannot show that the concerns motivating his termination are false and pretext for disability discrimination.**   To show pretext and defeat summary judgment, Mitchell must come forward with "sufficient evidence to demonstrate both that the employer's articulated reason for the adverse employment action was false *and* that discrimination was the real reason." *Holston v. City of Hope, Ark.*, 2020 WL 60246, at *9 (W.D. Ark. Jan. 6, 2020) (cleaned up) (emphasis in original). He "'must do more than simply create a factual dispute as to the issue of pretext; he must offer sufficient evidence for a reasonable trier of fact to infer discrimination.'" *Id.* (quoting *Mathews v. Trilogy Commc'ns, Inc.*, 143 F.3d 1160, 1165 (8th Cir. 1998)). "'A plaintiff may show pretext, among other ways, by showing that an employer (1) failed to follow its own policies, (2) treated similarly-situated employees in a disparate manner, or (3) shifted its explanation of the employment decision.'" *Schaffhauser v. United Parcel Serv., Inc.*, 794 F.3d 899, 904 (8th Cir. 2015) (citation omitted). Mitchell cannot do so.

Mitchell cannot dispute that as a new employee he was subject to a 90-day probationary period *intended* to allow Diez to evaluate whether a new employee like him had the necessary skills for the job and whether he would comply with company policy. (Facts ¶ 5.) One would expect that Mitchell, or any other probationary employee, would understand that it was important to make a positive impression during this 90-day period. Yet Mitchell cannot deny that his supervisor was dissatisfied with the time it took him to complete basic tasks, or that he scored unsatisfactorily on a skills test. (*Id.* ¶¶ 13, 16-17, 23-24.) Also, he cannot deny that one of the relevant policies related to attendance and included a two-absence maximum during the probationary period. But Mitchell no-showed on his *second* scheduled work day, and had a second (and final) allowed absence a few weeks later—only a third of the way through the probationary period. (*Id.* ¶¶ 6, 25-27.) The record further shows that Mitchell's immediate supervisor recommended Mitchell be terminated for these performance and attendance concerns *even before* the purported disability occurred in May 2022—that is, *even before* Mitchell failed to report an alleged workplace injury. (*Id.* ¶¶ 28-29.) And on that front, Mitchell cannot deny that Diez's handbook states that employees must report injuries to their supervisors or Human Resources "immediately" and "no later than the end of [their] shift"—and that failure to do so even *once* is a terminable offense all by itself. (*Id.* ¶¶ 8-9.) Diez had a good-faith belief (reflected in contemporaneous notes) that Mitchell originally claimed that the injury happened *weeks* prior to his report, then claimed that it happened "recently," before finally settling on "last night" after he was reminded of the policy. (*Id.* at ¶¶ 35-39.) But even if one credited Mitchell's new story that he was injured May 18 and reported May 19, it remains undisputed that Mitchell did not report his purported injury to either his supervisor or HR "by the end of" his shift, in violation of company

policy. (*Id.* ¶ 31.) This alone—and certainly in combination with the performance and attendance concerns—warranted his termination.[3]

Mitchell cannot show that these motivations are false and pretext for discrimination. He has no evidence that Diez deviated from company policy when it terminated him. He has no evidence that other similarly-situated probationary employees without an injury—but with the same performance concerns, attendance concerns, and policy violations—were *not* terminated. (Facts ¶¶ 58-59.) Instead, Mitchell's only apparent basis for alleging pretext is that the termination happened on May 24, 2022—six days after the injury he now claims occurred on May 18 that serves as his purported "disability," and five days after his untimely May 19 report of a workplace injury. (*Id.* ¶ 57.) Putting aside that this argument is a non-sequitur (when else would one expect immediate termination, if not shortly after immediately-terminable misconduct?),[4] Eighth Circuit law is clear that temporal proximity alone cannot raise a jury question of pretext. *Corkrean v. Drake Univ.*, 55 F.4th 623, 632 (8th Cir. 2022); *Sprenger v. Fed. Home Loan Bank of Des Moines*, 253 F.3d 1106, 1114 (8th Cir. 2001). And even—unlike here—where there is evidence apart from temporal proximity, the probative value of a temporal proximity argument is undercut when "the employer had been concerned about a problem before the employee engaged in the protected

---

[3] Mitchell has suggested that his failure to immediately report was excused because neither Vestal nor Melvin were physically present at the plant when he injured himself on May 18. But at deposition, he confirmed that he had previously communicated work-related matters to Vestal and Melvin via cell phone, yet admittedly made no attempt to do so on May 18. (Facts ¶¶ 18, 31.) Nor did he try to report the injury to anyone who was on-site at Diez that night. (*Id.* ¶ 31.)

[4] Other courts have recognized the logical flaw in this sort of temporal proximity argument. *See, e.g.*, *Wierman v. Casey's Gen. Stores*, 638 F.3d 984, 998 (8th Cir. 2011) ("Any discriminatory inference based on this temporal proximity is dubious, as Johnson reviewed the video footage on April 30 and learned that Wierman was violating the employee discount policy…She was fired six days later…The discovery of the video footage gives an explanation for the temporal proximity other than a discriminatory motive of Casey's, and is not evidence of pretext."); *Smith v. Allen Health Sys., Inc.*, 302 F.3d 827, 834 (8th Cir. 2002) (similar).

activity." *Smith*, 302 F.3d at 834 (temporal proximity insufficient to show pretext in FMLA retaliation case when employer spoke to plaintiff about performance issue before plaintiff took leave); *Corkrean*, 55 F.4th at 632 (temporal proximity argument was "severely undercut by the fact that Gerhard was complaining about Corkrean's performance deficiencies at least a month before Corkrean even told Gerhard about her MS and need for FMLA leave"); *Sprenger*, 253 F.3d at 1114 ("The fact that the Banks' rationale relies on the entire course of Sprenger's performance, however, dulls the effect of proximity."). Mitchell cannot show that the reasons for his termination were false and pretext for discrimination.

### III. Mitchell's failure to accommodate claims (Counts III and VII) also fail because, even though he never requested accommodation, he was accommodated.

Mitchell's failure to accommodate claims[5] are similarly baseless, even if one assumed that his temporary minor strain was a "disability." Under either statute, before a plaintiff can successfully claim failure to accommodate, he must make at least two threshold showings. *First*, he must have requested accommodation. *See, e.g.*, *Walz v. Ameriprise Fin., Inc.*, 779 F.3d 842, 847 (8th Cir. 2015) (employer is not liable for its failure to accommodate an employee who made no request for accommodation); *Ballard v. Rubin,* 284 F.3d 957, 964 (8th Cir. 2002).

*Second*, a party must show that he was *not* given a reasonable accommodation despite the request. *See, e.g.*, *Withers v. Johnson*, 763 F.3d 998, 1004 (8th Cir. 2014) (dismissing failure to accommodate claim: "The record demonstrates that Johnson accommodated all of Withers's known limitations during the period of his employment at issue."); *Mobley v. St. Luke's Health Sys., Inc.*, 53 F.4th 452, 457 (8th Cir. 2022) (similar); *E.E.O.C. v. Prod. Fabricators, Inc.*, 2013

---

[5] Because Missouri courts look to federal case law when deciding claims under the MHRA, Diez addresses Mitchell's ADA and MHRA claims together. *See, e.g.*, *Diallo v. Catalent Pharma Sols., LLC*, 2020 WL 3105095, at *2 (W.D. Mo. June 11, 2020); *Daugherty v. City of Md. Heights*, 231 S.W.3d 814, 818 (Mo. 2007) (*en banc*), *abrogated on other grounds*.

WL 1104731, at \*9 (D. Minn. Mar. 18, 2013), *aff'd*, 763 F.3d 963 (8th Cir. 2014) ("[H]is claim fails because no reasonable accommodation was communicated to PFI that was unfulfilled…"). And when a person's injuries preclude his ability to perform his workplace duties, leave can be a reasonable accommodation. *Jackson v. Gen. Motors, LLC*, 2020 WL 3469334, at \*26 (E.D. Mo. June 25, 2020) ("Leave can be a reasonable accommodation, and the Court concludes it was in this case when no jobs existed in the Assembly Plant that met Plaintiff's limitations."); *Bright v. Evonik Cyro, LLC*, 2013 WL 2395264, at \*7 (E.D. Ark. May 30, 2013) (placing plaintiff on short-term disability leave was reasonable accommodation when there were no vacant positions that plaintiff could transfer to).

Mitchell's claims fail for either reason. He admitted at his deposition that he never requested accommodation for his purported disability. (Facts ¶ 48.) He also admitted that the only accommodation that was available to him during the three weeks of his injury was light duty, but that light duty work was unavailable. (*Id.* ¶¶ 43-44.) Given that, it was a reasonable accommodation for Diez to place Mitchell on a leave of absence while he had work restrictions.

This conclusion that Diez reasonably accommodated Mitchell's injury does not change because Mitchell was terminated while he was on leave. An employee's leave status does not immunize him from consequences for poor performance, policy violations, or the like. *Kiel v. Select Artificials, Inc*., 169 F.3d 1131, 1136 (8th Cir. 1999) ("the anti-discrimination statutes do not insulate an employee from discipline for violating the employer's rules"); *cf. Jackson v. St. Joseph State Hosp*., 840 F.2d 1387, 1391 (8th Cir. 1988) (protection from retaliation "does not clothe the complainant with immunity for past and present inadequacies, unsatisfactory performance, and uncivil conduct"). Consequently, the act of terminating an employee who is receiving an accommodation does not reflect an "ending" of the accommodation for liability

purposes. *See Larsen v. Maynard, Inc.*, 2019 WL 2774329, at *9 (W.D. Ark. July 2, 2019) (granting summary judgment to employer on failure to accommodate claim: "It is not enough to say that a termination prevents some future, nebulous, unspecified request that an employee *might* have made, for then every terminated employee with a disability would allege that employers 'ceased' accommodating them when disciplinary action was taken against them…") (emphasis in original).

## IV. Mitchell's retaliatory termination claims (Counts I and IV) fail for the same reasons as the disability termination claims.

Mitchell finally recasts his termination as being "retaliation" for either requesting an accommodation under the ADA (Count IV) or for seeking workers' compensation benefits (Count I). Both claims fail as a matter of law. The ultimate issue for both Mitchell's ADA and workers' compensation claims is the same: whether Diez's reasons for terminating him were legitimate and not pretext for retaliation.[6] *See, e.g.*, *Oehmke*, 844 F.3d at 758 (under *McDonnell Douglas* framework, ADA retaliation claim fails if plaintiff does not show employer's rationale was pretextual); *Ashby v. Woodridge of Mo., Inc.*, 673 S.W.3d 537, 548 (Mo. Ct. App. 2023) (Missouri workers' compensation retaliation claim fails "'if the basis for the discharge is valid and nonpretextual'") (citation omitted).

Here, the facts underlying Mitchell's retaliation claims are the same facts underlying his discrimination claims. Diez had legitimate, non-retaliatory reasons for terminating him—concerns with his job performance, attendance, and violation of policy. (Facts ¶ 56.) These are just as legitimate reasons for the retaliation claims as for the discrimination claims. *See, e.g.*, *E.E.O.C. v.*

---

[6] ADA retaliation claims require a "*but-for* causal connection between the employee's assertion of her ADA rights and an adverse action by the employer." *Oehmke*, 844 F.3d at 758 (citing *Univ. of Tex. Sw. Med. Ctr. v. Nassar*, 570 U.S. 338 (2013)) (emphasis added). This means that "the plaintiff must show that the protected conduct was a determinative—not merely a motivating—factor in the employer's adverse employment decision." *Bevill v. Home Depot U.S.A., Inc.*, 753 F. Supp. 2d 816, 829 (S.D. Iowa 2009) (cleaned up).

*Prod. Fabricators, Inc.*, 763 F.3d 963, 974 (8th Cir. 2014) (poor performance was legitimate, non-retaliatory reason for adverse action); *Jackson*, 2020 WL 3469334, at *30 (violation of attendance policy was "facially legitimate, non-retaliatory justification for Plaintiff's termination"); *Rogers v. Entergy Ark., Inc.*, 2008 WL 4368637, at *5 (E.D. Ark. Sept. 19, 2008) (violations of company policy were legitimate non-retaliatory reasons for adverse actions); *Ashby*, 673 S.W.3d at 548 (affirming grant of summary judgment to employer: "'the anti-discrimination statutes do not insulate an employee from discipline for violating the employer's rules or disrupting the workplace'") (citation omitted).

As before, Mitchell has no direct evidence of retaliation arising from his injury, admitting that no one at Diez ever discouraged him from seeking workers' compensation benefits or made a negative comment about his claim, and that his claim was promptly and fully paid out—even *after* the termination.[7] (Facts ¶¶ 61-64.) He admits that he cannot point to any similarly-situated comparators who did not seek workers' compensation benefits and were retained. (*Id.* ¶¶ 58-59.) And he cannot cite any deviation from company policy or shifting rationales for his termination.

Instead, Mitchell advances the same flawed "temporal proximity" argument in support of his claim that these reasons were pretextual. (Ex. C, Mitchell Dep. 49:22-53:14.) But this argument is just as futile for the retaliation claims as it is for the discrimination claims. *See, e.g.*, *Withers*, 763 F.3d at 1005 ("Withers mentions the temporal proximity of his leave to his termination, but timing alone is not sufficient to create a genuine issue of fact, particularly given that Johnson's proffered reason for the termination arose in the same window of time."); *Ashby*, 673 S.W.3d at 548 ("'Generally, more than a temporal connection between the protected conduct and the adverse

---

[7] Indeed, this fact all but eliminates any suggestion of workers' compensation retaliation. *See Ashby*, 673 S.W.3d at 547 (affirming summary judgment to employer when claim was processed "normally").

employment action is required to present a genuine factual issue on retaliation.'") (quoting *Scroggins v. Univ. of Minn.*, 221 F.3d 1042, 1045 (8th Cir. 2000)); *St. Lawrence v. Trans World Airlines, Inc.*, 8 S.W.3d 143, 150 (Mo. Ct. App. 1999) ("timing alone cannot conclusively establish that an employee was discharged for exercising her rights under the Act"). His retaliation claims thus fail for the same reasons his discrimination claims do. *See Prod. Fabricators*, 763 F.3d at 974 ("Breaux advances the same pretext argument as he did in his discrimination claim, and for the same reasons addressed above, the evidence here does not demonstrate that PFI's reason for termination was pretext for retaliation. Accordingly, this retaliation claim fails."); *Magnussen v. Casey's Mktg. Co.*, 787 F. Supp. 2d 929, 960 (N.D. Iowa 2011) (similar).

## Conclusion

The Court should enter summary judgment for Diez and dismiss all of Mitchell's claims.

Respectfully submitted,

Dated: January 15, 2024

By: */s/ Robert J. Finkel*
Robert J. Finkel (*admitted pro hac*)
KIENBAUM HARDY
VIVIANO PELTON & FORREST, P.L.C.
280 N. Old Woodward Ave., Ste. 400
Birmingham, MI 48009
(248) 645-0000 (main)
(248) 458-4581 (fax)
rfinkel@khvpf.com

Matthew J. Westering (MO Bar No. 61134)
SEYFERTH BLUMENTHAL & HARRIS LLC
4801 Main St., Ste. 310
Kansas City, MO 64112
(816) 756-0700 Telephone
(816) 756-3700 Facsimile
matt@sbhlaw.com

**Attorneys for Defendants**