# IN THE UNITED STATES DISTRICT COURT FOR THE
## WESTERN DISTRICT OF MISSOURI
## WESTERN DIVISION

RICHARD MITCHELL,                )
                                 )
                    Plaintiff,   )
                                 )
v.                               )          Case No. 4:23-cv-00138-GAF
                                 )
THE DIEZ GROUP, LLC              )
d/b/a DIEZ GROUP,                )
                                 )
And                              )
                                 )
THE DIEZ GROUP KANSAS CITY       )
LLC d/b/a DELACO STEEL KANSAS    )
CITY                             )
                                 )
                    Defendants.  )

---

## PLAINTIFF'S SUGGESTIONS IN OPPOSITION TO
## DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

---

Respectfully submitted,

By: _/s/_____M. Katherine Paulus_____
M. Katherine Paulus, MO 60217
Drew M. Russell, MO 75746
CORNERSTONE LAW FIRM
5821 NW 72nd Street
Kansas City, Missouri 64151
(816) 581-4040 Telephone
(816) 741-8889 Facsimile
m.paulus@cornerstonefirm.com
d.russell@cornerstonefirm.com

**ATTORNEYS FOR PLAINTIFF**

i

# TABLE OF CONTENTS

Page Number

TABLE OF AUTHORITIES                                                                  iii

I.      STATEMENTS OF FACT                                                           vi

        A.  Plaintiff's Responses to Defendant's Purportedly            vi
            Uncontroverted Statements of Material Fact

        B.  Plaintiff's Additional Statements of Material Fact            xxvii

II.     INTRODUCTION                                                                   1

III.    LEGAL STANDARDS FOR SUMMARY JUDGMENT           2

IV.     ARGUMENT & AUTHORITIES                                             2

        A.  Defendant is not Entitled to Summary Judgment on Mitchell's      2
            Workers' Compensation Retaliation Claim

        B.  There are Genuine Disputed Issues of Fact Regarding Mitchell's    4
            Prima Facie Disability Discrimination Claims

            1.  A Reasonable Juror Could Find Mitchell was              4
                Disabled Under Either Statute

            2.  Mitchell Could Perform the Essential Functions of his    6
                Position with or without Reasonable Accommodations,
                and his Termination Occurred Under Circumstances
                Giving Rise to and Inference of Discrimination

        C.  Mitchell has Aduced Sufficient Evidence of Pretext to         8
            Preclude Summary Judgment

        D.  Defendants are not Entitled to Summary Judgment on Mitchell's   13
            Failure to Accommodate Claims

        E.  Defendants are not Entitled to Summary Judgment on           14
            Mitchell's ADAAA Retaliation Claim

V.      CONCLUSION                                                                   15

Case 4:23-cv-00138-GAF   Document 44   Filed 02/12/24   Page 2 of 47

# TABLE OF AUTHORITIES

**CASES**

*Anderson v. Global*,
   78 F.4th 1031 (8th. Cir. 2015)                                                8, 11

*Anderson v. Liberty Lobby, Inc.*,
   477 U.S. 242 (1986)                                                          2

*Alley v. Foley Indus.*,
   No. 2:20-cv-04054-NKL 2021 U.S. Dist. LEXIS 242069 (W.D. Mo. Dec. 20, 2021) 3, 10, 11

*Ashby v. Woodridge of Mo., Inc.*,
   673 S.W.3d 537, 544 (Mo. Ct. App. 2023)                                      4

*Brannon v. Luco Mop. Co.*,
   52 F.3d 843 (8th Cir. 2008)                                                  13

*Brunckhorst v. City of Oak Park Heights*,
   914 F.3d 1177 (8th Cir. 2019)                                                13

*Brunko v. Mercy Hosp.*,
   260 F.3d 939 (8th Cir. 2001)                                                 6

*Canning v. Creighton Univ.*,
   995 F.3d 603 (8th Cir. 2021)                                                 6, 14

*Christensen v. Titan Distribution,* Inc.,
   481 F.3d 1085 (8th Cir. 2007)                                                8, 9

*Donathan v. Oakley Grain, Inc.*,
   861 F.3d 735 (8th Cir. 2017)                                                 3, 8

*Duncan v. Missouri*,
   No. 2:23-CV-30 PLC 2023 U.S. Dist. LEXIS 187054 (E.D. Mo. Oct. 18, 2023)     5

*EEOC v. Trans States Airlines, Inc.*,
   462 F.3d 987 (8th Cir. 2006)                                                 8

*Fatemi v. White*,
   775 F.3d 1022 (8th Cir. 2015)                                                8

*Fenney v. Dakota, Minn. & E.R.R. Co.*,
   327 F.3d 707, 712 (8th Cir. 2003)                                            13

Case 4:23-cv-00138-GAF   Document 44   Filed 02/12/24   Page 3 of 47

*Flagg v. Peterson Mfg. Co.,*
No. 18-00909 CV-W-ODS 2020 U.S. Dist. LEXIS 6728 (W.D. Mo. Jan. 15, 2020) 2

*Garrison v. DolgenCorp, LLC,*
939 F.3d 937 (8th Cir. 2019) ................................................................. 15

*Hairston v. Wormuth,*
6 F.4th 834 (8th Cir. 2021) ................................................................... 8

*Heisler v. Metropolitan Council,*
339 F.3d 622 (8th. Cir. 2003) ............................................................... 14

*Holden v. Hirner,*
663 F.3d 336 (8th Cir. 2011) ................................................................ 1

*Kammueller v. Loomis, Fargo & Co.,*
383 F.3d 779 (8th Cir. 2004) ................................................................ 7

*Kowitz v. Trinity Health,*
839 F.3d 742 (8th Cir. 2016) ................................................................ 15

*Lake v. Yellow Transport,*
596 F.3d 871 (8th. Cir. 2010) ............................................................... 12

*Oehmke v. Medtronic, Inc.,*
844 F.3d 748 (8th Cir. 2016) ................................................................ 14

*Peebles v. Potter,*
354 F.3d 761 (8th Cir. 2004) ................................................................ 13

*Powley v. Rail Crew Xpress, LLC,*
25 F.4th 610 (8th. Cir. 2022) ............................................................... 15

*Price v. N. States Power Co.,*
664 F.3d 1186 (8th Cir. 2011) .............................................................. 1

*Reeves v. Sanderson Plumbing Products, Inc.,*
530 U.S. 133 (2000) ............................................................................. 2

*Schweitzer v. Preferred Family Healthcare, Inc,*
2021 WL 5496081 (W.D. Mo. Nov. 23, 2021) ...................................... 15

*Smith v. Allen Health Sys.,*
302 F.3d 827 (8th Cir. 2002) ................................................................ 8, 9

iv

*Templemire v. W & M Welding, Inc.,*
   433 S.W.3d 371 (Mo. banc 2014)       2

*Torgerson v. City of Rochester,*
   643 F.3d 1031 (8th Cir. 2011).       2, 13

*Washington v. Advantage Metals Recycling, LLC,*
   No. 4:21-cv-00587-HFS 2023 U.S. Dist. LEXIS 164869 (W.D. Mo. Sep. 12, 2023) 7

*Woodsmith Publ'g Co. v. Meredith Corp.,*
   904 F.2d 1244 (8th Cir. 1990)       2

*Young v. Builders Steel Co.,*
   754 F.3d 573 (8th Cir. 2014)       7

**STATUTES**

42 U.S.C. § 12102       5, 6

Mo. Rev. Stat. § 213.010       4, 5

Mo. Rev. Stat. § 213.055       4

Mo. Rev. Stat. § 287.780       2

**RULES**

Fed. R. Civ. P. 56.       1

**REGULATIONS**

8 C.S.R. § 60-3.060       13

29 CFR § 1630.2       5

Mo. Code Regs. Ann. Tit. 8, 60-3.0606       5, 6

v

# I. STATEMENTS OF FACT

## A. Plaintiff's Responses to Defendant's Purportedly Uncontroverted Statements of Fact

1.      Diez prepares, stores, and sells aluminum and steel parts from six facilities across the eastern half of the United States. (*About us – The Diez Group*, https://thediezgroup.com/about- us-2/ (last visited January 11, 2024).)

**RESPONSE: Uncontroverted.**

2.      Its Kansas City plant specializes in punching shapes out of steel sheet metal. (Ex. A, Vestal Dep. 6:11-25.)

**RESPONSE:  Uncontroverted.**

3.      In March 2022, Diez hired Mitchell as a Maintenance Technician at its Kansas City plant. (Ex. B, Mitchell Dep. Ex. 2; *see also* Ex. C, Mitchell Dep. 20:14-16.)

**RESPONSE: Uncontroverted.**

4.      Before Mitchell started at Diez, he received training on the Company's policies, including those contained in the Employee Manual. (Ex. C, Mitchell Dep. 20:9-13; Ex. D, Mitchell Dep. Exs. 3 & 4; *see also* Ex. E, Melvin Dep. 8:20-9:24.)

**RESPONSE:  Uncontroverted.**

5.      The Employee Manual explains that all new hires at Diez must complete a 90-day "Introductory Period" which is intended "to allow management sufficient time to evaluate the employee's work habits, attendance and attitude, as well as his/her ability to meet work requirements and follow safety rules." (Ex. D, Mitchell Dep. Ex. 3 at 12.)

**RESPONSE:  Uncontroverted.**

6.      During the Introductory Period, employees are permitted up to two absences; employees with three absences may be terminated. (*Id.* at 41.)

**RESPONSE: Controverted in part. Uncontroverted that Defendants' Attendance Policy states that employees subject to an Introductory Period are permitted up to two attendance "*occurrences* (late, leave early or absence)" during that period*,* and that employees who incur three or more attendance *occurrences* during that period may be subject to termination. Defendant's Exhibit D (Doc. 36-5 at 46-47) (emphasis added). The Attendance policy goes on to explain that it is a point-based system in which points "will be accumulated for occurrences of tardiness, absence or failure to properly report an absence or tardy." *Id.* at 47. Moreover, this policy defines the amount of points assessed for arriving late, leaving early, being absent, and unreported or improperly reported absences but also states "occurrences of absence for which points *shall not* be assessed are classified as such when the absence is due to" several reasons, including PTO/Sick "and has proper documentation." *Id.* (emphasis added). The policy states disciplinary action will be documented and provided to the employee in a written disciplinary letter when they accumulate three points. *Id.* at 47-48.**

7.    The Employee Manual outlines procedures for reporting work-related injuries. (*Id.* at 22.)

**RESPONSE:        Controverted in part. Uncontroverted that the cited portion of Defendants' Employee Manual states"[a]ny suspected unsafe conditions and all injuries or accidents that occur on the job must be reported immediately to your supervisor and the Human Resources Department" and "[i]f you or another employee are injured or have damaged something, you must contact your supervisor immediately (no later than end of shift depending on extenuating circumstances." Doc. 36-5 at 27. Controverted that the Employee Manual outlines any procedures an employee is expected to follow when his or her supervisor is unavailable at the time of the injury and/or before the end of his or her shift. *See id.***

8.    Diez employees are required to report any injuries to their supervisors or Human

Resources immediately or, at the latest, by the end of their shift. (*Id.*)

**RESPONSE: Controverted in part. Uncontroverted that the cited portion of Defendants' Employee Manual states "*[a]ny suspected unsafe conditions and all injuries or accidents that occur on the job* must be reported immediately to your supervisor and the Human Resources Department" and "[i]f you or another employee are injured or have damaged something, you must contact your supervisor immediately (no later than end of shift depending on extenuating circumstances." Doc. 36-5 at 27 (emphasis added). Controverted that the Employee Manual outlines what e an employee is expected to do when his or her supervisor is unavailable at the time of the injury and/or before the end of his or her shift, or that it states employees must report any injuries to Human Resources at the latest, by the end of their shift. *See id.***

9.        Failure to do so can lead to discipline, up to and including dismissal. (*Id.*; *see also id.* at 46.)

**RESPONSE:  This statement is not supported by the cited portion of the record, which states in pertinent part: "[i]t is the responsibility of each employee to accept and follow established safety rules and procedures. Failure to report *such infractions* may result in disciplinary action, including termination." *Id.* (emphasis added). While Defendants also cite page 46 of the Employee Manual (Doc. 36-5 at 51) where work rule number 26 states "[f[ailure to report a work related accident, injury, illness or damage in a timely manner, no later than the end of the shift," however, on page 44 of the Employee Manual (*id.* at 49)—immediately before the listing of such work rules —it states "[a]n employee shall be deemed to have been *warned, suspended, or discharged* for just cause in all cases where violation of any of the following occurs." Doc. 36-5 at 49, 51. (emphasis added).**

10.        Mitchell began working at Diez on March 28, 2022. (Ex. C, Mitchell Dep. 20:14-16.)

**RESPONSE: Uncontroverted.**

11.     He reported to Maintenance Manager Ryan Vestal who, in turn, reported to Plant Manager Matt Hunt. (Ex. C, Mitchell Dep. 19:21-23; Ex. A, Vestal Dep. 6:2-5, 25:13-14.)

**RESPONSE: Uncontroverted.**

12.     As a Maintenance Technician, Mitchell was responsible for adjusting and repairing both the manufacturing equipment and facilities at the Kansas City plant. (Ex. F, Mitchell Dep. Ex. 7.)

**RESPONSE: Uncontroverted that the cited job description states a Maintenance Technician "[a]djusts, repairs, and maintains all manufacturing, support and facilities equipment." Doc. 36-7. The remainder of this statement is not supported by the cited portion of the record.**

13.     After observing Mitchell's performance, Vestal believed that Mitchell lacked basic maintenance skills and struggled to complete the work he was assigned. (Ex. A, Vestal Dep. 11:19- 12:21, 15:7-19, 16:17-22.)

**RESPONSE: Controverted in part. Uncontroverted that Vestal testified that he believed Mitchell struggled to complete repairs or other jobs that Vestal assigned him. Controverted that Vestal testified he believed Mitchell "lacked basic maintenance skills," as the cited portions of the record only reflect Vestal's belief that Mitchell's mechanical, technical and electrical *knowledge* was not very extensive and/or lacking. *See* Ex.1, Vestal Dep. at 11:19-12:6 (line of questioning regarding Mitchell's knowledge); 15:7-19 ("…lack of knowledge of mechanical, technical, electrical"); 16:17-22 (providing answer to question requesting example of Mitchell's lack of mechanical knowledge). Moreover, Defendants failed to note the context of Vestal's testimony regarding Mitchell's purported "lack" of electrical or mechanical knowledge—*i.e.* that Vestal repeatedly explained that he did not**

believe Mitchell's level of knowledge in these areas was commensurate with the job experience listed in Mitchell's resume. *See* **PSOF ¶¶ 1.**

14.  In one instance, Vestal asked Mitchell to re-run air lines, a task that Vestal considered to be easy and straightforward. (*Id.* at 17:1-3.)

**RESPONSE: Uncontroverted, but misleading without further context. Vestal testified he asked Mitchell to re-run air lines during Mitchell's *first* week of employment with the company, and for the first three weeks of Mitchell's employment, he was scheduled to work "split" shifts so he could receive training during the day shift. Ex. 1, Vestal Dep. at 10:14-11:7; 17:7-9.**

15.  Mitchell was unable to complete the job and Vestal ended up finishing it himself. (*Id.* at 17:4-6.)

**RESPONSE: Controverted in part. Uncontroverted that Vestal testified he finished re-running the air lines himself. Controverted that Vestal did so because Mitchell was unable to complete the job, as the cited portion of Vestal's testimony does not support that portion of the purported statement of fact; rather, it states that Vestal "ended up finishing the air lines myself as [Mitchell] watched me, so I showed him how to do it. And this was a continuous process with [Mitchell].** *Id.* **at 17:4-6.**

16.  On another occasion, Vestal instructed Mitchell to run sticks of electrical conduit and tapped two of Mitchell's colleagues to train him on how to do it. (Ex. G, Vestal Dep. Ex. 2; *see also* Ex. A, Vestal Dep. 12:4-6.)

**RESPONSE: Controverted in part. Uncontroverted that on one occasion, Mitchell was instructed to run sticks of electrical conduit. Controverted that Vestal directly instructed Mitchell to do so, as Mitchell testified it was Matt Barker who instructed him to run conduit through the building. Ex. 2, Mitchell Depo. at 28:5-29:13.**

x

17.     It took Mitchell his entire ten-hour shift to install two sticks of conduit, a task that Vestal estimated could have been completed by a competent technician in less than 30 minutes. (Ex. G, Vestal Dep. Ex. 2; Ex. A, Vestal Dep. 29:16-18.)

**RESPONSE: Controverted.  Mitchell testified that he was unsure why he was being tasked with running conduit when there were Pipe Benders employed by the company who were trained to do that specific task, and that he advised Matt Barker (who had instructed him to complete the task) that Mitchell could do the electrical wiring part of the job, but that he did not do pipe bending.  Ex. 2, Mitchell Dep. at 28:5-29:13. Mitchell also testified he installed conduit everywhere throughout the building where they needed it to be run.** *Id.* **at 29:14-23. Mitchell also left notes in his work log for that date indicating others were working on the tables where the conduit was, which was a potential safety issue.  (Ex. 3, Mitchell's Daily Work Log for 4/21/22).**

18.     Mitchell could communicate via phone and text message with both Vestal and Human Resources Generalist Sharon Melvin. (Ex. C, Mitchell Dep. 77:7-10; Ex. A, Vestal Dep. 30:22-31:5, 48:22-49:8; Ex. E, Melvin Dep. 5:17-19; *see also* Ex. G, Vestal Dep. Ex. 2 (noting that Mitchell had texted Vestal about a certification).

**RESPONSE:  Uncontroverted.**

19.     However, Mitchell sometimes failed to communicate with Vestal and would instead send details about his progress to Melvin. (Ex. A, Vestal Dep. 26:12-20; Ex. H, Vestal Dep. Ex. 1.)

**RESPONSE:  Uncontroverted, but immaterial.**

20.     Vestal took several steps to address Mitchell's performance issues. (*See infra* ¶¶ 21-23.)

**RESPONSE:   This purported statement of fact is not supported by any citations to the record.**

21.     He asked the other Maintenance Technicians to show him how to complete maintenance tasks. (Ex. A, Vestal Dep. 12:22-13:2; Ex. G, Vestal Dep. Ex. 2.)

**RESPONSE: Controverted. In the cited testimony, in response to the question of whether anyone other than Vestal provided *training* to Mitchell, Vestal indicated maintenance supervisor Matt Barker did so. Ex. 1, Vestal Depo. at 12:22-13:2. Vestal went on to explain that Barker's job duties as a maintenance supervisor were to "oversee the techs to make sure they're doing their job in the most efficient way." *Id.* at 13:3-7. The April 20, 2020 email Vestal sent to Melvin and Hunt (Defendant's Exhibit G only reflects that an individual named Mitch Gruis "walked [Mitchell] through" the job task of running conduit "and instructed [him] how to perform the job" and that Barker (a supervisor/lead) had instructed Mitchell on how to operate the Gene man lift. *Id.* Finally, neither Vestal's cited testimony nor his cited email support that Vestal asked other Maintenance Technicians to show Mitchell how to complete tasks, or that he did so as one of the "steps to address Mitchell's performance issues" as indicated in Defendants' SOF ¶ 20.**

22.     Mitchell, Vestal, Melvin, and Hunt met to discuss Vestal's feedback on April 19, 2022. (Ex. H, Vestal Dep. Ex 1; Ex. A, Vestal Dep. 24:1-14.)

**RESPONSE: Controverted in part. Uncontroverted that the cited portion of the record reflects that Mitchell, Vestal, Melvin, and Hunt met on April 19, 2022. Controverted to the extent this purported statement of fact implies that the purpose of that meeting was to discuss Vestal's feedback regarding Plaintiff's performance from a skills or knowledge perspective. The cited portion of Vestal's testimony, and Melvin's handwritten notes from that meeting (Defendant's Exhibit H) reflect that the topics discussed at that meeting were Mitchell's performance not being "where it needs to be at this time," that Mitchell "was not working nights, per his offer letter that he signed," and that Vestal was "at his witt's [*sic*] end" as**

Mitchell "put words in [Vestal's] mouth." *See* Exhibit A to Doc. 36-1 (Vestal's Depo.) at 24:1-14; Exhibit H to Doc. 36-1 (Melvin's handwritten notes).

23.     When Mitchell's performance still did not improve, Vestal administered a written exam to gauge Mitchell's knowledge about basic maintenance procedures. (Ex. A, Vestal Dep. 46:3-15.)

**RESPONSE:  Uncontroverted that Vestal administered a written maintenance test to Mitchell. The remainder of this purported statement of fact is not supported by the cited portion of the record.**

24.     Although Melvin saw Mitchell looking up answers on his phone during the test, Mitchell scored 43% on it. (Ex. E, Melvin Dep. 21:10-18; Ex. I, Melvin Decl. Ex. 1.)

**RESPONSE: Controverted. Melvin admitted that Mitchell was not instructed that he could not use his phone during the test, and she testified that after she observed Mitchell looking at his phone during the test, she simply informed Vestal of that fact.  Ex. 4, Melvin Dep. at 21:10-22:2. After he informed Mitchell that he had not passed the test, Vestal did not say anything else to Mitchell about his performance or anything related to the test. Ex. 1, Vestal Dep. at 52:10-15. Vestal testified there were not any consequences for Mitchell not passing the test—it "was just to gauge where he was at." *Id.* at 52:16-19. Mitchell also claims that he did not use his cell phone during the test. Exhibit 8, Mitchell Declaration ¶ 12. Additionally, Mitchell claims that it was Vestal who watched over him while he took the test, and that Melvin was not even present in the area at the time it was taken. *Id.* at ¶ 14-16. Mitchell also claims that Vestal never told him what his score was. *Id.* at ¶ 18.**

25.     Just two days after he started at Diez, Mitchell was absent from work. (Ex. J, Mitchell Dep. Ex. 5; *see also* Ex. C, Mitchell Dep. 30:16-18.)

**RESPONSE:  Uncontroverted, but incomplete without further context. The time**

records Defendants produced for Mitchell indicate that on March 30, 2022, he showed up and worked from 5:50 a.m. until 6:34 a.m. when he went home sick, and that Vestal suggested Mitchell take a COVID test. Ex. 5, Excerpt of Mitchell Time Records at Defendant's Document Production 000269. *See also* Plaintiff's Response to DSOF ¶ 6 (Defendants' Attendance Policy states points are not "chargeable" against an employee for absences for PTO/Sickness with proper documentation (which Defendants' time records suggest Plaintiff had submitted for his March 30, 2022 absence).

26.      On April 23, 2022 – less than a month after he was hired – Mitchell did not show up for his shift or call in his absence. (Ex. J, Mitchell Dep. Ex. 5.)

**RESPONSE:**      **Controverted. The time records Defendants produced for Mitchell indicate showed up and worked from 11:00 p.m. until 2:30 a.m. on April 23, 2022, but list him as "No Call/No Show" and absent for the remainder of that shift. Ex. 5, Excerpt of Mitchell Time Records at Defendant's Document Production 000268.  Based on Plaintiff's time entries from other dates around that time, it appears Plaintiff worked his shift on that day until the time he typically took a meal break (2:30 a.m.), but did not work the post-meal break portion of that shift. *See id.* Under the relevant portion of Defendants' Attendance Policy, leaving more than two hours early from an employee's shift will be assessed as one point, and a "no call/no show" (which is defined as an unreported or improperly reported absence including a failure to call at least one hour prior to the start of a shift to report an expected absence) results in the assessment of 1.5 points . *See* Defendant's Exhibit D/Doc. 36-5 at 42**

27.      As a result, Mitchell received a written attendance warning. (*Id.*)

**RESPONSE: Uncontroverted that Mitchell was issued a written warning for purportedly accruing 2.5 attendance points as of April 25, 2022. The remainder of this statement**

is controverted *See* Plaintiff's Response to DSOF ¶ 6 (noting Defendants' Attendance Policy states written warnings will be issued when employees accrue three attendance points); Plaintiff's Response to DSOF ¶26.

28.     Based on Mitchell's consistent history of poor performance and attendance, Vestal spoke with Hunt and recommended that Mitchell be terminated. (Ex. A, Vestal Dep. 47:1-17.)

**RESPONSE: Controverted in part. Uncontroverted that Vestal testified he made a recommendation to Hunt that Mitchell be terminated, but the remainder of this statement— that Vestal made that recommendation "based on Mitchell's consistent history of poor performance and attendance"--is not supported by the cited portion of the record. Controverted to the extent this statement implies that Hunt relied upon Vestal's recommendation when Hunt allegedly made the decision to terminate Mitchell's employment. Vestal testified he only became aware that a decision had been made to terminate Mitchell's employment when someone (whose identity he cannot recall) told him that Mitchell had been terminated. When asked what his understanding of the reason for Mitchell's termination was, Vestal answered, "I would say it was probably because of the job performance, but, I mean, it wasn't my doing, so." Ex. 1, Vestal Dep. at 37:20-38:17. *See also* Plaintiff's Responses to DSOF ¶¶ 55, 56 (noting shifting identification of decisionmaker and reasons for Mitchell's termination).**

29.     Vestal made this recommendation before Mitchell reported his work-related injury. (*Id.* at 47:10-12.)

**RESPONSE: Controverted. Vestal testified he did not make the decision to terminate Mitchell's employment, and only became aware the decision had been made when someone (whose identity he cannot recall) told him Mitchell had been terminated. When asked what his understanding of the reason for Mitchell's termination was, Vestal answered, "I would say**

it was probably because of the job performance, but, I mean, it wasn't my doing, so." **Ex. 1, Vestal Dep. at 37:20-38:17.**

30.     According to Mitchell, he strained his right shoulder while unwrapping coils of sheet metal during his shift on May 18, 2022. (Ex. C, Mitchell Dep. 32:18-20, 35:22-36:12.)

**RESPONSE: Uncontroverted.**

31.     He did not report his injury to anyone at Diez before his shift ended. (*Id.* at 36:22-37:4, 38:24-39:4.)

**RESPONSE: Uncontroverted, but misleading without further context. As Plaintiff explained in his deposition testimony, he injured his shoulder on May 18, 2022 while he was working the night shift, and neither his supervisor (Vestal) nor HR Generalist Melvin were present during that night shift (Ex. 2, Mitchell Depo. at 36:13-21; 73:4-20); Plaintiff called Melvin the next morning when she was back in the office to report his injury (*id.* at 38:21-39:7). *See also* Ex. 1, Vestal Depo. at 15:1-6 (Vestal did not typically schedule himself to be physically working at the facility during the night shift)**

32.     Instead, on May 19, 2022, he told Melvin that he had been injured on the job. (*Id.* at 31:17-20, 37:3-6, 38:24-39:7.)

**RESPONSE: Uncontroverted.**

33.     Melvin instructed Mitchell to come to the plant to pick up a form authorizing him to seek medical attention at the Company's occupational healthcare provider, Concentra. (*Id.* at 31:17-32:1, 37:7-12, 39:22-25; Ex. E, Melvin Dep. 25:11-17; Ex. K, Melvin Decl. ¶ 5.)

**RESPONSE: Uncontroverted.**

34.     When Mitchell arrived at the office, Melvin asked him to elaborate on the circumstances of his injury so she could complete an internal incident report. (Ex. E, Melvin Dep. 26:12-28:2.)

**RESPONSE: Uncontroverted, but incomplete.** Melvin testified she had already started working on the Incident Report between the time Mitchell called her to report his injury and the time he arrived in her office to pick up his authorization for treatment form. Ex. 4, Melvin Depo. at 26:12- 22. That Incident Report form, which Melvin completed after she sought and received additional information from Mitchell during their conversation in her office, indicates the date of Plaintiff's injury incident was May 18, 2022. *Id.* at 53:14-54:13; Ex. 6, Incident Investigation Report (Defendant's Document Production 255-259)

35.     Melvin asked Mitchell when he had been injured. (*Id.* at 28:13-15.)

**RESPONSE: Uncontroverted.**

36.     Melvin recalls (and her contemporaneous notes reflect) that Mitchell first told her that he had hurt his shoulder "a few weeks ago." (*Id.* at 28:16-25; Ex. L, Melvin Dep. Ex. 6 (Melvin's handwritten notes of her conversation with Mitchell: "What time? Not sure. 2-3 weeks ago").)

**RESPONSE: Controverted.** Plaintiff testified he only told Melvin his injury happened while he was working the night shift the prior night; he denies ever telling Melvin that his injury occurred "recently" or "two or three weeks ago."     Ex. 2, Mitchell Depo. at 32:6-20. Additionally—and contrary to her testimony that Mitchell allegedly first told her he hurt his shoulder "a few weeks ago," Melvin wrote on Mitchell's termination Personnel Action Form (dated May 24, 2022) that Mitchell "[f]iled work related injury claiming recently occurred, *then* claimed it happened a couple weeks earlier. Violation CO Standards #21 Pg 46." Defendant's Exhibit Q.

37.     Melvin clarified by asking "A few weeks ago?" and Mitchell responded "[W]ell, it was recently." (Ex. E, Melvin Dep. 28:16-19.)

          **RESPONSE: Controverted.** Plaintiff denies ever telling Melvin his injury occurred recently or "two or three weeks ago." Ex. 2, Mitchell Depo. at 32:6-20. *See also*

Termination Personnel Action Form, Defendant's Exhibit Q (Melvin completed form in which she indicated Mitchell reported work injury claiming first that it occurred "recently," then later stating it happened two or three weeks ago).

38.     Melvin then reminded Mitchell about the Company's policy on timely injury reports. (*Id.* at 29:7-11.)

**RESPONSE: Controverted. Plaintiff denies ever telling Melvin his injury occurred recently or "two or three weeks ago." Ex. 2, Mitchell Depo. at 32:6-20.** *See also* **Termination Personnel Action Form, Exhibit Q to Doc. 361** *See also* **Plaintiff's Response to DSOF ¶ 34 (noting Melvin did not include in the Incident Investigation Report any reference to Mitchell providing conflicting information about the timing of his injury and indicated the injury occurred on May 19, 2022); PSOF ¶ 17 (noting First Report of Injury form which Melvin testified was prepared by insurance company using information she provided also did not include any reference to conflicting information about the timing of Mitchell's injury, and also indicated the injury occurred on May 19, 2022).**

39.     At that point, Mitchell told Melvin that he had strained his shoulder the night before, on May 18. (*Id.* at 30:22-25.)

**RESPONSE: Controverted in part. Uncontroverted that Mitchell told Melvin he had strained his shoulder while working a night shift on May 18th.** *See* **Ex. 2, Mitchell Depo. at 32:6-20. Controverted that Mitchell only told Melvin that he injured himself on the night of May 18th** *after* **Melvin reminded him of the company's policy on timely reporting injuries.** *See id.*

40.     Later that day, a physician's assistant at Concentra diagnosed Mitchell with "cervical strain," "strain of shoulder, right," and "thoracic myofascial strain." (Ex. M, Mitchell Dep. Ex. 6.)

**RESPONSE: Uncontroverted.**

41.    The physician's assistant noted that Mitchell could return to work that same day but could not lift more than 10 pounds, push or pull more than 10 pounds, or reach above his shoulder with his right arm. (*Id.*)

**RESPONSE: Uncontroverted.**

42.    The Maintenance Technician position involved frequent lifting of items weighing over 50 pounds. (Ex. F, Mitchell Dep. Ex. 7 at 2.)

**RESPONSE: Controverted in part. Uncontroverted that the cited job description states that employees in the Maintenance Technician position "must frequently lift and/or move items over 50 pounds." Doc. 36-7 at 1. The remainder of this statement is not supported by the cited portion of the record, and whether the Maintenance Technician position actually involved "frequent" lifting of items weighing over 50 pounds is controverted by the Physical Demands form for the position which Melvin completed and submitted to Defendants' workers compensation insurance provider. *See* PSOF ¶ 15.**

43.    Mitchell was thus unable to perform his regular job duties. (Ex. C, Mitchell Dep. 41:5-8, 41:24-42:5, 60:17-21.)

**RESPONSE:  Controverted in part. Uncontroverted Mitchell was—during the period of time he was subject to the work restrictions—unable to perform any job duties which had physical demands which required him to lift more than 10 pounds, push or pull more than 10 pounds, or reach above his shoulder with his right arm.  Controverted that such physical demands were essential duties of Maintenance Technician position (*see* PSOF ¶¶ 10). Mitchell also testified he could have performed the essential functions of his job with the accommodation of light duty work. Ex. 2,  Mitchell Depo. at 60:3-11.**

44.    At the time, Diez did not have any open positions that complied with Mitchell's restrictions. (*Id.* at 60:12-14; Ex. A, Vestal Dep. 35:20-23; Ex. E, Melvin Dep. 35:3-15.)

**RESPONSE: Controverted in part. Uncontroverted that Melvin testified the company did not have any light duty work available for Mitchell and that Melvin advised Mitchell that the company could not fully accommodate his restrictions (*see* Doc. 36-5 at 35:3-15); and further uncontroverted that Vestal similarly testified that no light duty work was available for Mitchell at the time he had light-duty restrictions. *See* Doc. 36-1 at 35:20-23. Controverted to the extent this statement implies that Defendants only lacked light duty work at or around the time Mitchell was subject to light duty restrictions; Vestal testified that during his employment with Defendants, he does not recall any time that the company had light duty work available. Ex. 1 Vestal Depo. at 35:23-36:3.**

45.     As of May 19, 2022, Mitchell was placed on a leave of absence pending the removal of his movement restrictions. (Ex. C, Mitchell Dep. 63:23-25.)

**RESPONSE: Uncontroverted that Mitchell testified he was placed on an approved leave of absence. The remainder of this statement is not supported by the cited portions of the record. *See* Doc. 36-3 at 63:23-25.**

46.     Melvin told Mitchell to follow up with his treatments at Concentra. (*Id.* at 42:6-10, 63:20-22.)

**RESPONSE:  Uncontroverted.**

47.     Over the coming days, Mitchell attended several follow-up appointments at the Concentra clinic and received physical therapy for his shoulder. (*Id.* at 45:22-46:7; Ex. N, Melvin Decl. Ex. 5.)

**RESPONSE: Uncontroverted.**

48.     At his deposition, Mitchell testified that he never requested an accommodation for his injury. (Ex. C, Mitchell Dep. 61:3-9.)

**RESPONSE: Controverted. Mitchell testified he could have performed the essential**

functions of his job with the accommodation of light duty work, and he also testified he requested light duty work during a conversation with Melvin after he learned of his work restrictions. Ex. 2, Mitchell Depo. at 60:3-11; 75:20-76:20.

49. No manager at Diez ever pressured Mitchell to return to work or violate his medical restrictions. (*See, e.g.,* Ex. A, Vestal Dep. 34:17-19 (Vestal never spoke to Mitchell about his injury); Ex. E, Melvin Dep. 34:20-35:25; Ex. O, Melvin Dep. Ex. 8.)

**RESPONSE: The cited portion of the record does not support this purported statement of fact—*i.e.* that *no manager* at the company *ever* pressured Mitchell to return to work or violate his medical restrictions. The cited portion of Vestal's testimony only reflects that Vestal never spoke to Mitchell about his injury. *See* Exhibit A to Doc. 36-1 at 34:17-19. The cited portion of Melvin's testimony reflects her recollection of the conversation she had with Mitchell regarding his work restrictions, the company's inability to accommodate them, and the lack of available work for him to perform within his restrictions (which could arguably be construed as a form of pressure for Mitchell). Doc. 36-5 at 34:20-35:25. The cited text message exchange between Mitchell and Melvin further fails to support this purported statement of fact; the only reference it contains to Mitchell's continued need to incur injury-related absences from work (i.e. his May 24, 2022 text to Melvin that he was "off" until he saw the doctor next Tuesday) received the following response from Melvin: "We no longer need your services. Please return your badge so it's not charged back to you." Doc. 36-16.**

50. Nor did anyone at Diez ever make any negative comments about Mitchell's injury. (*See, e.g.,* Ex. C, Mitchell Dep. 63:17-19 (Melvin never made any negative comments about Mitchell's injury); Ex. A, Vestal Dep. 33:10-35:15.)

**RESPONSE: The cited portion of the record does not support this purported statement of fact—*i.e.* that no one at the company ever made any negative comments about**

Mitchell's injury. In the cited portion of Mitchell's testimony, when asked whether Melvin ever any negative comments *about him being disabled,* Mitchell responded "no." *See* Defendant's Exhibit C to Doc. 36-1 at 63:17-19. And the cited portion of Vestal's testimony merely reflects that he learned of Mitchell's injury from a conversation with Melvin, and that Vestal never spoke with Mitchell after he reported his injury. *See* Defendant's Exhibit A to Doc. 36-1 at 33:10-35:15. This statement of fact is also controverted by the last text exchange between Mitchell and Melvin (*i.e.* his May 24, 2022 text to Melvin that he was "off" until he saw the doctor next Tuesday) which received the following response from Melvin: "We no longer need your services. Please return your badge so it's not charged back to you." Exhibit O to Doc. 36-1. Further controverted by Melvin's testimony that after learning of Mitchell's workplace injury, at some point in that same day (May 19, 2022), she called Mike Berry (the Vice President in charge of that location) who instructed Melvin to deny Mitchell's claim. *See* PSOF ¶ 16.

51.    No one at Diez ever made any negative comments about Mitchell's leave of absence. (*See, e.g.*, Ex. A, Vestal Dep. 33:10-35:15; Ex. O, Melvin Dep. Ex. 8.)

**RESPONSE:** The cited portion of the record does not support this purported statement of fact—*i.e.* that *no one* at the company *ever* made any negative comments about Mitchell's leave of absence. The cited portion of Vestal's testimony only reflects that Vestal learned about Mitchell's reporting of a workplace injury through a conversation with Melvin, and that Melvin later advised him of Mitchell's restrictions and told him Mitchell would be off for a period of time. *See* Doc. 36-1 at 33:10-35:15. The cited text message exchange between Mitchell and Melvin arguably undermines the proposition for which it was cited, as the only reference to Mitchell's injury-related absences from work it contains (*i.e.* his May 24, 2022 text to Melvin that he was "off" until he saw the doctor next Tuesday) received the following

response from Melvin: "We no longer need your services. Please return your badge so it's not charged back to you." Doc. 36-16.

52. On June 9, 2022, three weeks after he allegedly strained his shoulder, Mitchell was released from medical treatment and authorized to return to work without restriction. (Ex. P, Mitchell Dep. Ex. 8.)

**RESPONSE: Uncontroverted that Mitchell was released from medical treatment and authorized to return to work without restriction on June 9, 2022 (which was three weeks and one day after his May 18, 2022 injury). Controverted to the extent this statement implies Mitchell's physical impairment had fully resolved as of June 9, 2022, as he testified that when his treatment asked the percentage of his ability to perform his work, Mitchell told her it was maybe 85%, not 100%, but that since he had already been terminated by that date, there was "nothing they could do." Ex. 2, Mitchell Depo. at 56:2-24.**

53. Mitchell did not continue with physical therapy for his shoulder after June 9, 2022. (Ex. C, Mitchell Dep. 46:8-10.)

**RESPONSE: Uncontroverted, but incomplete. Mitchell testified his understanding was he could not continue to be seen for physical therapy after that date because he had already been terminated and Defendants did not send hi for further therapy. Ex. 2, Mitchell Depo. at 62: 20-63:4.**

54. Since June 9, 2022, Mitchell has been able to work without restriction. (*Id.* at 58:2-4.)

**RESPONSE: Controverted in part. Uncontroverted that Mitchell testified that he has been able to work since June 9, 2022. Controverted as to the remainder of this purported statement of fact, as it is not supported by the cited portion of the record. Plaintiff testified he continues to have back and shoulder problems that require him to take medication in order to "suppress the pain in order for [him] to perform [his] daily duties" and that he cannot work "at a hundred**

percent." Ex. 2_, Mitchell Depo. 57:18-58:4.

55. In late May 2022, Hunt decided to dismiss Mitchell. (Ex. A, Vestal Dep. 38:1-4; Ex. Q, Melvin Dep. Ex. 9.)

**RESPONSE: Controverted. In their Answer to Plaintiff's First Set of Interrogatories, Defendants stated the decision to terminate Plaintiff's employment was made by Vestal. Ex. 7, Defendants' Interrogatory Answers at Answer to No. 9. Defendants similarly identified Vestal as the decisionmaker for Mitchell's termination in the position statement they submitted to the EEOC in response to Mitchell's Charge of Discrimination. *See* PSOF ¶ 7 (citing Ex. 9, Defendants' Position Statement/Defendant's Document Production 286-288). But in his deposition testimony, Vestal denies he was the one who made the decision to terminate Mitchell's employment, and states that (to his knowledge), it was Hunt who made the decision to terminate Mitchell's employment. Ex. 1, Vestal Depo. at 37:20-38:-4.. Additionally, Melvin initially testified she did not know whether it was Hunt or Vestal who made the decision to terminate Mitchell's employment, or when that decision was made (Ex. 4, Melvin Depo. at 46:7-14). Melvin later clarified that Hunt and Vestal had a meeting in the office, then called her into that office at which time Hunt told her to release Mitchell from his employment. *Id.* at 50:10-51:4. Plaintiff further notes Defendants' Exhibit Q (Exhibit 9 to Melvin's Deposition)—*i.e.* the Personnel Action Form reflecting Mitchell's termination effective May 23, 2022—neither identifies Hunt as the decisionmaker for Mitchell's termination nor indicates that the decision to terminate Mitchell's employment was made "in late May." *See* Doc. 36-18. Finally, when Melvin was asked whether she recognized the "management" signature on that form, she answered, "I think it's Matt Hunt, but I can't promise it. Not sure. I don't—I don't recognize it." Ex. 4, Melvin Depo. at 47:5-19, 48:16-20.**

56. His decision was motivated by three considerations: (1) Mitchell's recurring

performance issues and lack of fundamental skills; (2) Mitchell's poor attendance record; and (3) his belief that Mitchell had violated company policy by failing to timely report his injury. (Ex. Q, Melvin Dep. Ex. 9; *see also* Ex. E, Melvin Dep. 57:22-58:7.)

**RESPONSE: Controverted, and not supported by the cited portion of the record. Melvin testified that when Hunt told her to release Mitchell from his employment, Hunt did not tell her why Mitchell was being released. Ex. 2, Melvin Depo. at 50:16-21. *See also id.* at 57:22-58:3 ("When I sent the text message to Mitchell, I was told just to release him. Afterwards, we sat down…and asked [Hunt] why so I could fill out the paperwork."). The Personnel Action Form (Defendant's Exhibit Q/Exhibit 9 to Melvin's deposition) cited by Defendants does not support this purported statement of fact as it neither identifies Hunt as the decisionmaker for Mitchell's termination nor states that the three listed "considerations" above motivated that decision. *See* Doc. 36-18. Melvin testified that she was the one who completed the Personnel Action Form cited by Defendants (*id.* at 47:5-21; 49:14-16); she was also the person who decided to include the narrative/additional notes found on the form stating Mitchell "[f]iled work related injury claiming recently occurred, then claimed it happened a couple weeks earlier violation Co Standards # 21 Pg 46" (*id.* at 47:22-48:8; 49:17-20), and that she completed the form after she had already notified Mitchell (on May 24th) that his services were no longer needed (*id.* at 49:21-24). Melvin also testified that after she notified Mitchell of his termination, she sat down with Hunt and asked him why Mitchell had been terminated so she could "fill out the paperwork," at which time Hunt "instructed [her] it's because of his attendance issues and he was still under his probationary period." *Id.* at 57:13-58:7.**

57.     Melvin notified Mitchell of his termination via text message on May 24, 2022. (Ex. O, Melvin Dep. Ex. 8.)

**RESPONSE: Uncontroverted.**

58.     Mitchell is unaware of any other employees at Diez who failed to immediately report an injury and were not terminated. (Ex. C, Mitchell Dep. 64:1-5.)

**RESPONSE: Uncontroverted, but immaterial. *See also* Plaintiff's Response to DSOF ¶¶ 7-9 (controverting that a failure to immediately report an injury is grounds for immediate termination under Defendants' Employee Manual policies).**

59.     Mitchell is unaware of any other employees at Diez who were counseled for poor performance, had more than two attendance points, and violated company policy and were not terminated. (*Id.* at 64:6-13.)

**RESPONSE: Uncontroverted, but immaterial. *See also* Plaintiff's Responses to DSOF ¶¶ 7-9, 22, 36-38, 55 and 56; PSOF ¶¶ 14.**

60.     Shortly after she learned of Mitchell's injury, Melvin submitted a claim to Diez's workers' compensation insurer, The Chubb Corporation. (Ex. E, Melvin Dep. 38:20-25; Ex. K, Melvin Decl. ¶ 3; Ex. R, Melvin Decl. Ex. 2.)

**RESPONSE: Controverted in part. Uncontroverted that Melvin testified she called the Chubb group to report Mitchell's claim on the same day Mitchell reported his injury and went to the clinic for treatment. Ex. 4, Melvin Depo. at 38:12-25, 39:6-8. Controverted that Melvin submitted that claim "shortly after she learned of Mitchell's injury," as she also testified that after learning of Mitchell's injury, she called Mike Berry (the Vice President in charge of that location) who instructed Melvin to deny Mitchell's claim, and she cannot recall whether she called Chubb before or after she spoke with Berry. *Id.* at 37:2-38:11, 39:1-5.**

61.     Chubb promptly processed Mitchell's claim. (*See, e.g.*, Ex. R, Melvin Decl. Ex. 2; Ex. S, Melvin Decl. Ex. 3.)

**RESPONSE: Uncontroverted.**

62.     Chubb paid Mitchell $2,319.99—the equivalent of three weeks of wages. (Ex. T, Melvin Decl. Ex. 4; *see also* Ex. C, Mitchell Dep. 49:6-11 (Mitchell received workers' compensation benefits and Diez never challenged his right to receive them).)

**RESPONSE: Uncontroverted, but immaterial.**

63.     No one at Diez ever discouraged Mitchell from seeking workers' compensation benefits for his shoulder strain. (Ex. C, Mitchell Dep. 47:15-18.)

**RESPONSE: Uncontroverted that Mitchell testified no one from the Diez Group ever discouraged him from filing a workers' compensation claim. The remainder of this purported statement of fact is not supported by the cited portion of the record.**

64.     No one at Diez ever made a negative comment about Mitchell's workers' compensation claim to him. (*Id.* at 47:19-21.)

**RESPONSE: Uncontroverted that Mitchell testified no one from the Diez Group ever made a negative comment to him about *filing* his workers' compensation claim. *See* Defendants' Exhibit C at 47:19-21. The remainder of this purported statement of fact is not supported by the cited portion of the record.**

### B.     Plaintiff's Additional Statements of Material Fact

1.     Vestal testified Mitchell did not demonstrate the type of mechanical, technical, or electrical knowledge he would have expected to see given the job experience Vestal recalls Mitchell listing on his resume. Ex. 1, Vestal Depo. at 15:7-19.

2.     Vestal testified that Mitchell's resume indicated Mitchell had a Bachelor's degree in science and associated science from Purdue, and had prior work experience: at General Electric Aviation and for Toyota Logistics Service, as a quality engineer at Kaizen, as a production and rail supervisor, and through serving in the United States Army and Coast Guard as an aviation machinist. Ex. 1, Vestal Depo. at 15:20-16:10.

3. Defendants' counsel introduced Mitchell's alleged resume reflecting the work experience, military service, and educational background Vestal referenced in his testimony as Exhibit 4 to Vestal's deposition. Ex. 1_, Vestal Depo. at 45:6-17; Ex. 8 , Mitchell Declaration at ¶ 5; Exhibit B to Ex. 8 (Alleged Resume for Mitchell/Exhibit 4 to Vestal's Deposition).

4. This was not the resume that Mitchell actually gave to Defendants when he applied for employment with them. (Ex. 8_, Mitchell Declaration at ¶ 5; Exhibit A to Ex. 8 (Mitchell's Actual Resume)

5. Mitchell did not prepare the resume introduced as Exhibit 4 to Vestal' deposition; he had never previously seen the document until a copy was provided to him during this lawsuit. *Id.* at ¶¶ 5-6.

6. Mitchell did not hold any of the positions listed on that resume, did not serve as an aviation machinist in the United States Army or Coast Guard, and did not attend Purdue University. *Id.* at ¶ 9.

7. Mitchell never lived at the address in Osceola, Indiana that was listed on that resume. Ex. 8, Mitchell Declaration at ¶ 7.

8. Mitchell never had the phone number or email address listed on that resume. Ex. 8, Mitchell Declaration at ¶ 8.

9. While Mitchell took the maintenance test on May 16, 2022, Vestal told him that others would be taking the maintenance test the next day. Ex. 8, Mitchell Declaration at ¶ 11.

10. Vestal told Mitchell that the maintenance test was not a pass or fail type test. Ex. 8, Mitchell Declaration at ¶ 19.

11. The position statement Defendants submitted to the EEOC in response to Mitchell's Charge of Discrimination indicated that "*after learning* [ ] that [Mitchell], in addition to all of his other performance problems and attendance violations, had violated Company rules by failing to report his

alleged work-related injury as required, *Mr. Vestal* made the decision to discharge [Mitchell] for failing to meet Company requirements during his introductory period." Ex. 9, Position Statement, Defendant's Document Production 286-289(emphasis added).

12. But Vestal testified he did not become aware of any purported confusion regarding the date that Mitchell was actually injured until after he had already been informed that Mitchell was terminated. Ex. 1, Vestal Depo. at 44:4-23).

13. Melvin initially testified that she did not know whether Hunt or Vestal made the ultimate termination decision, but then later said that it was Hunt who made the decision. Ex. 4, Melvin Depo. at 46:11-14; 50:10-19)

14. The "essential functions" of the Maintenance Technician position are listed in the job description for that position as follows;

- Perform maintenance jobs in accordance with the highest standards of efficiency
- Participate in continuous improvement projects Adhere to ISO 14001 and 1ATF 16949
- procedures and work instructions.
- Maintain the smooth running of the building facilities to include repairs, lighting, electrical systems, maintain plumbing system, alarm system, fire extinguishers. HVAC,
- Maintain the smooth running of the grounds.
- Maintain the smooth running of all production equipment within the plant
- Other duties as assigned by the Maintenance Manager.

Doc. 36-7 (Maintenance Technician Job Description); Ex. 7, Defendants' Interrogatory Answers at Answer to No. 16. (identifying the job description in their answer to an interrogatory requesting that Defendants identify the essential functions of the Maintenance Technician position that Mitchell held).

11. At some point, Melvin notified Defendants' workers' compensation insurance company that Mitchell's employment had been terminated. Ex. 4, Melvin Depo. at 51:20-52:4.

12. In an August 22, 2022 email, the insurance company examiner assigned to Mitchell's worker's compensation claim sent an email to Melvin indicating Mitchell was "fired due to

xxix

productivity effective 5/23/222" and that Mitchell "wasn't completing his assigned tasks during his shift." Exhibit 10, Email from Santiago to Melvin at Defendant's Document Production 234-235.

13.     In connection with their Interrogatory Answers, Defendants produced a chart indicating there were sixteen total Workers' Compensation claims filed against it by a total of fifteen employees at the same location where Mitchell worked during the time period of 2021-2023; that chart reflects Mitchell was terminated on May 23, 2022 for the reason of "attendance." Ex. 7, Defendants' Interrogatory Answers at Answer to No. 3 and Exhibit A to same.

14. All but one of the 15 employees identified in the chart Defendants provided in answer to Interrogatory Number 3 have been involuntarily terminated from their employment with the company; nine of them were terminated within two months or less of the date of their injury claim, and of those, five were terminated less than one month after the date of their injury claim. *Id.*

15. On the Physical Demands form for the Maintenance Technician that Melvin completed and provided to Defendants' workers' compensation insurance provider, she indicated the position required employees to spend zero hours at one time moving items weighing more than 10 pounds; a half hour or less at one time kneeling or squatting; a half hour to an hour at one time sitting bending or twisting at the waist; and indicated the position requires a total of 6-8 hours per day of walking. Ex. 11,  Physical Demands Form (Defendant's Document Production 209).

16.     Melvin testified that after learning of Mitchell's injury, she called Mike Berry (the Vice President in charge of their location) who instructed Melvin to deny Mitchell's workers' compensation claim. Ex. 4, Melvin Depo. at 37:2-38:11.

17. The First Report of Injury form—which Melvin testified was prepared by Defendants' workers' compensation insurance company using information Melvin provided to them—is devoid of any reference to Mitchell providing conflicting information about the timing of his injury, and also indicates Mitchell's injury occurred on May 18, 2022. Ex. 4 Melvin Depo. at 41:3-43:12; Ex. 12,

xxx

First Report of Injury Form (Exhibit 7 to Melvin Depo.)

## II. INTRODUCTION

On May 19, 2022, Plaintiff Richard Mitchell ("Mitchell") reported to Defendants' HR Generalist, Sharon Melvin, that he had suffered a workplace injury during the night shift he had worked the prior evening. After being evaluated by a medical provider later that same day, Mitchell informed Melvin of his diagnoses of "cervical strain," "strain of shoulder, right," and "thoracic myofascial strain" and his placement on associated work restrictions, and requested the reasonable accommodation of light duty work within his restrictions. However, Melvin informed Mitchell the company did not have work available for him within his restrictions, and instead instructed him to remain off work until he could return to work without those restrictions. On May 24, 2022—just six days after reporting his injury, disclosing his diagnosis and work restrictions, and requesting a reasonable accommodation--Melvin informed Mitchell his employment was terminated. In addition to the very close temporal proximity between these events, additional disputed issues of material fact also exist as to Mitchell's *prima facie* retaliation, disability discrimination, and failure to accommodate claims, and Plaintiff has adduced evidence sufficient for a reasonable juror to conclude Defendants' proffered reasons for terminating his employment were merely pretexts for retaliation and/or discrimination. For these reasons, and those set forth more fully below, Mitchell respectfully requests the Court deny Defendants' Motion for Summary Judgment (Docs. 36, 36-1).

## III. LEGAL STANDARDS FOR SUMMARY JUDGMENT

"Summary judgment is appropriate if the evidence, viewed in the light most favorable to the [nonmovant] and giving [the nonmovant] the benefit of all reasonable inferences, shows there are no genuine issues of material fact and [the movant] is entitled to judgment as a matter of law." *Price v. N. States Power Co.*, 664 F.3d 1186, 1191 (8th Cir. 2011). *See also* Fed. R. Civ. P. 56(a). "Once the moving party has made and supported their motion, the nonmoving party must proffer admissible evidence demonstrating a genuine dispute as to a material fact." *Holden v. Hirner*, 663 F.3d 336, 340 (8th Cir.

1

2011). Importantly, on a motion for summary judgment, the facts must be viewed in the light most favorable to the nonmoving party. *Torgerson v. City of Rochester,* 643 F.3d 1031, 1042 (8th Cir. 2011). Additionally, in considering a motion for summary judgment, the court "may not make credibility determinations or weigh the evidence", as "[c]redibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge." *Reeves v. Sanderson Plumbing Products, Inc.,* 530 U.S. 133, 150 (2000); *Torgerson,* 643 F.3d at 1042. Summary judgment should not be granted if a reasonable jury could find for the nonmoving party. *Woodsmith Publ'g Co. v. Meredith Corp.,* 904 F.2d 1244, 1247 (8th Cir. 1990) (citing *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, (1986)).

## IV. ARGUMENT AND AUTHORITIES

### A. Defendant is not Entitled to Summary Judgment on Mitchell's Workers' Compensation Retaliation Claim

"No employer or agent shall discharge or discriminate against any employee for exercising any of his or her rights under" Missouri's Worker's Compensation Law ("MCWL"), "when the exercising of such rights is the motivating factor[1] in the discharge or discrimination." Mo. Rev. Stat. § 287.780. To establish a claim for retaliation under the MCWL, Mitchell must show: (1) he was an employee of the defendant before the injury; (2) he exercised a right granted by the MCWL, (3) defendant discharged him, and (4) his exercise of a right granted by the MCWL was a "motivating factor" in his employer's decision to discharge him. *Flagg v. Peterson Mfg. Co.,* No. 18-00909-CV-W-ODS, 2020 U.S. Dist. LEXIS 6728, at *16 (W.D. Mo. Jan. 15, 2020) (citing Mo. Rev. Stat. § 287.780 (2017); *Templemire v. W & M Welding, Inc.,* 433 S.W.3d 371, 373 (Mo. banc 2014), as modified (May 27, 2014)).

---

[1] A motivating factor is one that "actually played a role in the discharge" and had a "determinative influence on the discharge or discrimination." Mo. Rev. Stat. § 287.780.

2

Here, Mitchell was hired by Defendants on March 28, 2022  (DSOF ¶ 10; Plf.'s Response to DSOF ¶ 10); Mitchell reported a workplace injury to Defendants on May 19, 2022[2] (DSOF ¶ 32; Plf.'s Response to DSOF ¶ 32); Defendants discharged Mitchell from his employment on May 24, 2022 (DSOF ¶ 57, Plf.'s Response to DSOF ¶ 57), and Defendants do not appear to dispute that these facts establish the first three elements of this claim. However, in arguing that Mitchell cannot point to any evidence sufficient to establish pretext, Defendants also tacitly challenge Mitchell's ability to establish the fourth *prima facie* element—*i.e.* that Mitchell's report of a workplace injury was a motivating factor in Defendants' decision to terminate his employment.

Defendants claim the temporal proximity between Mitchell's report of a workplace injury and his termination is--standing alone--insufficient evidence to demonstrate that Mitchell's exercise of his rights under the MWCL was the motivating factor in Defendants' decision to terminate his employment, or to demonstrate their purportedly legitimate and non-retaliatory reasons for terminating his employment were merely pretext for retaliation. But here, there were only six days between Mitchell's protected activity (DSOF ¶ 32) and his termination (DSOF ¶ 57), and "temporal proximity generally is of greater inferential weight when time frames are compressed." *Donathan v. Oakley Grain, Inc.,* 861 F.3d 735, 742-43 (8th Cir. 2017) (considering temporal proximity of eight days to be "a meaningful and compressed time frame"). Put differently, "[t]he closer in time the firing is to the exercise of the right, the stronger the inference of discrimination is." *Alley v. Foley Indus.,* No. 2:20-cv-04054-NKL, 2021 U.S. Dist. LEXIS 242069, at *7-8 (W.D. Mo. Dec. 20, 2021).

Additionally, in Section IV(C) regarding pretext, Mitchell points to other evidence relevant to establishing that his reporting of a workplace injury (and associated workers' compensation claim)

---

[2] *See Alley v. Foley Indus.,* No. 2:20-cv-04054-NKL, 2021 U.S. Dist. LEXIS 242069, at *7-8 (W.D. Mo. Dec. 20, 2021) (citing Mo. Rev. Stat. § 287.127)("Reporting a workplace injury to an employer is one of the employee's rights under Missouri's workers' compensation laws.")

actually played a role in, and had a determinative influence on his termination.[3] Accordingly, he incorporates by reference here the arguments, factual citations, and authorities stated in Section IV(C), and respectfully requests the Court deny Defendants' request for summary judgment as to this claim.

## B. There are Genuine Disputed Issues of Fact Regarding Mitchell's Prima Facie Disability Discrimination Claims

To establish a *prima facie* case of disability discrimination under the Americans with Disabilities Act, as Amended ("ADAAA") Mitchell must show that: (1) he is disabled as defined by that statute; (2) he is qualified to perform the essential functions of his job with or without reasonable accommodation, and (3) he suffered an adverse employment action under the circumstances that give rise to an inference of unlawful discrimination. *Heisler*, 339 F.3d at 626-627. Similarly, to establish a *prima facie* case of disability discrimination under the Missouri Human Rights Act ("MHRA"), Mitchell must show: (1) he was disabled as defined by that statute, (2) he was discharged, and (3) his disability was the motivating factor[4] in his discharge. *Ashby v. Woodridge of Mo., Inc.*, 673 S.W.3d 537, 544 (Mo. Ct. App. 2023).

### 1. *A Reasonable Juror Could Find Mitchell was Disabled Under Either Statute*

Defendants argue Mitchell's disability discrimination claims under the ADAAA and MHRA fail "at the threshold" because he purportedly cannot show he had a disability as defined by either

---

[3] *See e.g.* PSOF ¶ 16 (Melvin spoke to Vice President Mike Berry after Mitchell reported his injury; Berry told Melvin to deny Mitchell's claim); Plf.'s Responses to DSOF ¶¶ 36, 37, 55, 56 and PSOF ¶ 17 (Melvin did not indicate Mitchell provided conflicting information about the timing of his injury in other documents she prepared around the same time she completed the Termination PAF for him).

[4] Under the MHRA, it is unlawful for an employer to discharge an individual "because of" her disability. Mo. Rev. Stat. § 213.055.1(1).3. "[B]ecause of" requires the individual's disabled status to be "the motivating factor" for an adverse employment decision. Mo. Rev. Stat. § 213.010(2).

4

statute.[5] Defendants argue Mitchell cannot show he suffered a disability as defined by the ADAAA or MHRA because he purportedly only suffered a "temporary shoulder strain lasting only a few weeks." Doc. 36-1 at 16. But "[p]ursuant to the ADAAA, courts must construe disability 'in favor of broad coverage of individuals ... to the maximum extent permitted' by the law." *Duncan v. Missouri*, No. 2:23-CV-30 PLC, 2023 U.S. Dist. LEXIS 187054, at *5 (E.D. Mo. Oct. 18, 2023)(quoting 42 U.S.C. § 12102(4)(A)). Here, Mitchell's alleged disabling condition (Doc. 1 at ¶¶ 48, 84) diagnosed as "cervical strain," "strain of shoulder, right," and "thoracic myofascial strain" (DSOF ¶ 40; Plf's Response to DSOF ¶ 40) clearly meets the definition of a physical impairment under the ADAAA and the MHRA. *See* 29 CFR § 1630.2 (h)(1)(defining, in pertinent part, a "physical impairment" as "[a]ny physiological disorder or condition, cosmetic disfigurement, or anatomical loss affecting one or more body systems, such as neurological, musculoskeletal…"); Mo. Code Regs. Ann. Tit. 8, 60-3.0606(1)(A)(1) (same). Mitchell also alleges this condition substantially limits[6] several major life activities under the ADAAA, including the major bodily function of his musculoskeletal system as well as his activities of working, reaching, lifting, pushing, and pulling (Doc. 1 at ¶ 85) which are consistent with major life activities as defined under that statute. *See* 42. U.S.C. § 12102(2)(A)-(B). He similarly alleges substantial limitation

---

[5] Under the ADAAA, individuals are considered disabled if they: (1) have a physical or mental impairment that substantially limits on or more of a person's major life activities, (2) are regarded as having such an impairment, or (3) have a record of such an impairment. 42 U.S.C. § 12102 (1)(A)-(C). Under the MHRA, a protected "[d]isability" is defined as "a physical or mental impairment which substantially limits one or more of a person's major life activities, being regarded as having such an impairment, or a record of having such an impairment, which with or without reasonable accommodation does not interfere with performing the job[.]" Mo. Rev. Stat. § 213.010(5).

[6] An impairment substantially limits a major life activity if it renders a person unable to perform a major life activity or restricts the condition, manner, or duration under which an individual can perform a major life activity as compared to the average person in the general population. *See Heisler*, 339 F.3d at 627. *See also Daugherty*, 231 S.W.3d at 821. The regulations interpreting the ADAAA explain "[a]n impairment need not prevent, or significantly or severely restrict, the individual from performing a major life activity in order to be considered substantially limiting." 29 C.F.R. § 1630.2(g)-(i). Mitchell was placed on work restrictions limiting, *inter alia*, his ability to lift objects over 10 pounds, and Defendants had no light duty work available within these restrictions. *See* DSOF ¶¶ 40, 41, 44; Plf.'s Response to DSOF ¶¶ 40, 41, 44, 52, 54.

5

of major life activities as defined by the MHRA. *See* Doc. 1 at ¶ 49 (major life activities of "employment" and "musculoskeletal function"); *see also* Mo. Code Regs. Ann. tit. 8, § 60-3.0606(1)(C).

Additionally, there are disputed issues of fact as to whether Defendants regarded Mitchell as disabled. Under the ADAAA, an employee is "regarded as having . . . an impairment" if he or she establishes that the employer has subjected the individual "to an action prohibited under [the ADA] because of an actual or perceived physical or mental impairment whether or not the impairment limits or is perceived to limit a major life activity." 42 U.S.C. § 12102(3)(A). "Thus, a person is regarded as disabled if [his] employer mistakenly believes that [he] has a physical impairment that substantially limits one or more major life activities or mistakenly believes that an actual, non-limiting impairment substantially limits one or more major life activities." *Canning v. Creighton Univ.*, 995 F.3d 603, 615 (8th Cir. 2021) (citing *Brunko v. Mercy Hosp.*, 260 F.3d 939, 942 (8th Cir. 2001)). Defendants argue Mitchell cannot be "regarded as" disabled under the ADAAA or MHRA because his impairment was only temporary and did not permanently limit his abilities. *See* 42 U.S.C. § 12102(1)(E), (3)(B) (a person is not regarded as having a qualifying impairment when the impairment has an "actual or expected duration of 6 months or less"). But there are disputed issues of fact regarding the severity and "actual or expected" duration of Mitchell's physical impairment. Mitchell testified that even today he continues to have back and shoulder problems requiring him to take medication to "suppress the pain in order for [Mitchell] to perform [his] daily duties" and that even now, he cannot work "at a hundred percent." Plf.'s Response to DSOF ¶ 54.

  2. *Mitchell Could Perform the Essential Functions of his Position with or without Reasonable Accommodations, and His Termination Occurred Under Circumstances Giving Rise to an Inference of Discrimination*

Because Defendants argued Mitchell could not establish the threshold issue of disability as defined by the ADAAA or MHRA, they did not address the issue of whether Mitchell was qualified

to perform the essential functions of the Maintenance Technician position[7] with or without reasonable accommodations. Here, Defendants have indicated the Maintenance Technician job description sets forth the essential functions for that position. PSOF ¶ 10. And, while Defendants claim Mitchell admitted he could not perform the Maintenance Technician position's requirements with his work restrictions in place (DSOF ¶ 42), Mitchell testified he could perform the functions of that position with his requested reasonable accommodation of light duty work. See Plf.'s Response to DSOF ¶ 43. Mitchell can also point to evidence sufficient to create a disputed issue of fact as to whether the type (and frequency) of lifting of items in excess of 10 pounds were essential functions of the position. *See* Plf.'s Response to DSOF ¶¶ 42, 43; PSOF ¶ 15.

Finally, with respect to the last element of Mitchell's *prima facie* claims of disability discrimination under the ADAAA or MHRA, he notes the evidence of pretext adduced in this matter is also sufficient to demonstrate his termination occurred under circumstances giving rise to an inference of discrimination. *See Washington v. Advantage Metals Recycling, LLC*, No. 4:21-cv-00587-HFS, 2023 U.S. Dist. LEXIS 164869, at *14-15 (W.D. Mo. Sep. 12, 2023) ("Evidence of pretext, normally shown at step three of the *McDonnell Douglas* analysis can satisfy the inference of discrimination element of the prima facie case.").[8] Accordingly, Mitchell respectfully incorporates here by reference the arguments, factual citations, and authorities regarding pretext which are fully set forth in Section IV(C).

---

[7] "Essential functions of the job are 'fundamental job duties,' and the employer's judgment in this regard is considered 'highly probative.'" *Kammueller v. Loomis, Fargo & Co.*, 383 F.3d 779, 786 (8th Cir. 2004) (citation omitted). In addition to the employer's judgment, in determining whether a job duty is an essential function, courts consider numerous factors, including the written job descriptions for the position, the amount of time employees spend on the job performing the function, the consequences of not requiring the employee to perform the function, and the current work experience of employees in similar jobs. *Id.*

[8] More specifically, "[a]the inference-of-discrimination stage,[a] plaintiff may show pretext, among other ways, by showing that an employer (1) failed to follow its own policies, (2) treated similarly-situated employees in a disparate manner, or (3) shifted its explanation of the employment decision." *Young v. Builders Steel Co.*, 754 F.3d 573, 578 (8th Cir. 2014) (internal quotations and citations omitted).

7

### C. Mitchell has Adduced Sufficient Evidence of Pretext to Preclude Summary Judgment

As the Eighth Circuit recently reiterated, although the plaintiff bears the burden to provide evidence of pretext, "'to survive summary judgment [he] need not definitively prove that [his] employer's reason for firing [him] was pretextual-rather, [he] simply must adduc[e] enough admissible evidence to raise genuine doubt as to the legitimacy of the defendant's motive.'" *Anderson v. Global*, 78 F.4th 1031, 1039 (8th Cir. 2023) (quoting *Hairston v. Wormuth*, 6 F.4th 834, 843 (8th Cir. 2021)). Moreover, there are "several ways a plaintiff may create a genuine issue of material fact regarding whether an employer's explanation is pretext for discrimination." *Id.* Here, there is significant evidence in the factual record suggesting Defendant's proffered reason for terminating Mitchell's employment was merely a pretext for discrimination or retaliation. This is particularly true where, as here, the close temporal proximity and compressed timeline of Mitchell's engagement in protected activity under the MCWL and ADAA, disclosure of his diagnosed disabling condition and associated work restrictions, and request for reasonable accommodations relative to his termination (DSOF ¶¶ 10, 32, 57; Plf.'s Responses to DSOF ¶¶ 10, 32, 43, 44, 48, 51) are entitled to a greater "inferential weight." *Donathan*, 861 F.3d at 742-43.

First, Defendants' reasons or explanations for the termination decision have shifted over time—as has their identification of the decisionmaker for that decision. "A plaintiff may set forth evidence 'of shifting explanations . . . [that] give rise to an inference of pretext.'" *Fatemi v. White*, 775 F.3d 1022, 1047 (8th Cir. 2015) (quoting *EEOC v. Trans States Airlines, Inc.*, 462 F.3d 987, 995 (8th Cir. 2006)). *See also Smith v. Allen Health Sys.*, 302 F.3d 827, 835 (8th Cir. 2002)( "Substantial changes over time in the employer's proffered reason for its employment decision support a finding of pretext."); *Christensen v. Titan Distribution,* Inc., 481 F.3d 1085, 1095 (8th Cir. 2007) (listing the inability of any of Defendant's employees to accept responsibility for making the challenged decision as one of the three pieces of evidence that showed Defendant's proffered reason was pretextual).

8

More specifically, Defendants now contend Plant Manager Hunt made the decision to terminate Mitchell (DSOF ¶ 55), and Defendants further claim his decision to do so was "motivated by three considerations"—*i.e.* Mitchell's allegedly "recurring performance issues and lack of fundamental skills;" his allegedly "poor attendance record;: and "[Hunt's] belief that Mitchell had violated company policy by failing to timely report his injury." *See* DSOF ¶ 56. Defendants' contention that the specific purported performance issues they identified for Mitchell in their motion for summary judgment as well as Mitchell's "lack of fundamental skills" were considered by Hunt in making the termination decision represents a "substantial change" in their proffered reason for, (and identification of the decisionmaker regarding) the decision to terminate Mitchell's employment, *See Smith,* 302 F.3d at 835; *Christensen* 481 F.3d at 1095. Defendant's contention is also belied by the factual record.

When Hunt directed Melvin to release Mitchell from his position, Hunt did not tell her why he made that decision. Plf.'s Response to DSOF ¶ 56. After she notified Mitchell of his termination, Melvin sat down with Hunt so she could complete the requisite paper work, at which time Hunt told her the termination was "because of [Mitchell's] attendance issues and he was still under his probationary period." *Id.* The termination codes which Melvin selected on Mitchell's Termination PAF (a form which she completed after speaking with Hunt) were "Excessive Absences/Tardies" and "Unsatisfactory Probationary Period." *Id.* Defendants may argue there has not been a substantial change in their proffered reason because the "Unsatisfactory Probationary Period" termination code either contemplated or was intended to encompass Mitchell's alleged "performance issues" and "lack of fundamental skills" such as those Defendants now describe in DSOF ¶¶ 13, 16-17, 23-24, and they have made prior reference to Mitchell's performance issues when describing the reasons for his termination.

However, even though Defendants previously included a vague reference in their position statement to Mitchell's purported performance issues when discussing the decision to terminate his

9

employment, they indicated it was *Vestal* and not Hunt who made that decision. PSOF ¶ 11. Defendants also asserted therein that Mitchell "did not perform adequately in his job," but other than the attendance written warning he received, the only specific performance issues they identify for him were his alleged refusal to work night shifts despite being hired for them, and his alleged failure to communicate with his supervisor, Vestal, (which were the issues for which they claim Mitchell was counseled during the April 19, 2022 meeting between him, Vestal, Hunt, and Melvin). *See* PSOF ¶ 11 and Plaintiff's Ex. 9 at 2); Plf.'s Responses to DSOF ¶ 22. [9] But at his deposition, Vestal *denied* making the decision to terminate Mitchell's employment (or even knowing the decision had been made until someone informed him Mitchell had been terminated) (PSOF ¶ 12; Plf.'s Response to DSOF ¶ 28); he also testified that his understanding of the reason Mitchell was terminated "was probably because of the job performance, but, I mean, it wasn't my doing, so." Plf.'s Response to DSOF ¶ 28.

Notably, another court within this district has found similar conflicting evidence of who was involved in the decision to terminate a plaintiff to be "evidence that the defendant's proffered reasoning is pretextual because it is more likely that no one would want to accept responsibility for an illegal retaliatory firing than a decision that was made for legitimate reasons." *Alley*, 2021 U.S. Dist. LEXIS 242069 at *23-24 (concluding a "reasonable jury could determine that no one at [defendant] has taken reasonability for the decision to fire [plaintiff]" where defendant's interrogatory answer that identified three individuals as participating in the decision was contradicted by those individuals' respective deposition testimony).

The examples of Mitchell's alleged poor performance identified by Defendants in their motion for summary judgment are largely based on the testimony of Mitchell's supervisor, Vestal. *See e.g.* DSOF ¶¶ 13-22, 24. But as previously noted, Vestal's testimony contradicts Defendants' prior

---

[9] Defendants' answer to an interrogatory asking them to specify the reasons for which Mitchell was terminated similarly includes a vague reference to Mitchell's "performance issues" without further elaboration, and also indicates Vestal was the sole decisionmaker for the termination decision. Plf.'s Responses to DSOF ¶ 55.

representations that he was the decisionmaker for Mitchell's termination. *See* Plf.'s Response to DSOF ¶¶ 55, 56. Defendants attempt to gloss over this issue by noting Vestal made a recommendation to terminate Mitchell's employment to Hunt at some point prior to the date Mitchell reported his workplace injury. DSOF ¶ 28. But Defendants neither point to evidence that Vestal identified these performance issues as the rationale for the termination recommendation he allegedly made to Hunt (*see* Plf.'s Response to DSOF ¶ 28), nor to any evidence that Hunt relied on Vestal's recommendation when deciding to terminate Mitchell (*id.*). Moreover, there are issues of fact which call the veracity of Vestal's testimony on Mitchell's performance and alleged lack of skills into question, and thus, raise "genuine doubt as to the legitimacy of the defendant's motive.'" *Anderson*, 78 F.4th at 1039. For instance, Vestal testified Mitchell did not demonstrate the type of mechanical, technical, or electrical knowledge he would have expected to see given the job experience he recalled Mitchell listing on his resume, however, there is strong evidence that the resume (and thus, the job experience contained therein) which Vestal identified as belonging to Mitchell was *not* a resume that was prepared or submitted by Mitchell. *See* PSOF ¶¶ 1-6. This also serves as further evidence calling into question Vestal's overall credibility as witness, and bolsters the factual issues Mitchell identified in Plf.'s Responses to DSOF ¶¶ 13-22, 24. *See Alley,* 2021 U.S. Dist. LEXIS 242069 at *14 (denying summary judgment and noting "it is for a jury to determine the credibility of these witnesses. Just because a witness says something does not mean it is true.")

The second consideration Defendants point to as motivating Hunt's termination decision ( Mitchell's "poor attendance record") is one which corresponds with one of the termination reason codes that Melvin recorded for Mitchell in his Termination PAF. *See* Plf.'s Response to DSOF ¶ 56, Defendant's Ex. Q. However, Defendants either misstate or misconstrue the specific provision of the Attendance Policy applicable to employees subject to an Introductory Period—a provision which they rely on when arguing that Mitchell's attendance justified his termination. *See* Plf.'s Response to DSOF

11

¶¶ 6, 26, 27. Mitchell has also demonstrated disputed issues of fact regarding the underlying attendance "occurrences" referenced in the April 27, 2022 attendance written warning, and further disputes of fact as to whether Defendants followed their own Attendance Policy when issuing this written warning to Mitchell. *See* Plf.'s Response to DSOF ¶¶6, 25-27. *See Lake v. Yellow Transp., Inc.*, 596 F.3d 871, 874 (8th Cir. 2010) (pretext may be shown with evidence that defendant failed to follow its own policies).

Finally, there is no record evidence to support Defendants' contention that the termination decision was also motivated by "*Hunt's* belief that Mitchell had violated company policy by failing to timely report his injury," (DSOF ¶ 56)(emphasis added). Melvin completed the Personnel Action Form after speaking with Hunt, but *she* decided to also include a statement that Mitchell "[f]iled work related injury claiming recently occurring, then claimed it happened a couple weeks earlier violation Co Standards # 21 Pg 46" *Id.* The statement is inconsistent with Melvin's later deposition testimony regarding what Mitchell told her about the timing of his injury (*see* DSOF ¶¶ 36, 37; Plf.'s Responses to DSOF ¶¶ 36, 37), and Melvin made no reference to Mitchell providing conflicting information about the timing of his injury or a purported violation of company policy on the Incident Investigation Report she had completed after speaking with Mitchell in her office on May 19, 2022 (which is when she contends he gave her conflicting information about the timing of his injury, *see* DSOF ¶ 38 ); rather, she merely indicated on that document that Mitchell's injury occurred on May 18, 2022. *See* Plf.'s Response to DSOF ¶ 34.[10]

Finally, Mitchell has adduced evidence suggesting a retaliatory motive for his termination, including Berry's directive to Melvin to deny Mitchell's workers' compensation claim on the same day Mitchell reported his injury (PSOF ¶ 16), and the number of other employees who worked at the same

---

[10] Additionally, the First Report of Injury form—which Melvin testified was prepared by Defendants' workers' compensation insurance company using information Melvin provided to them—is similarly devoid of any reference to Mitchell providing conflicting information about the timing of his injury, and also indicates Mitchell's injury occurred on May 18, 2022. PSOF ¶ 17.

location as him, who similarly reported workplace injuries/filed workers' compensation claims, and were also terminated within two months or less of doing so. PSOF ¶¶ 13-14. Viewed in the light most favorable to Mitchell, and drawing all reasonable inferences therefrom in his favor, a reasonable juror could find evidence that Defendants' reasons for terminating Mitchell's employment are not worthy of credence. *See Torgerson*, 643 F.3d at 1047.

### D. Defendants are Not Entitled to Summary Judgment on Mitchell's Failure to Accommodate Claims

An employer can engage in disability discrimination under both the ADAAA and the MHRA by failing to "make reasonable accommodation to the known physical or mental limitation of an otherwise qualified applicant or employee with a disability." *Peebles v. Potter*, 354 F.3d 761, 766 (8th Cir. 2004); 29 C.F.R § 1630.2(o)(4); 8 C.S.R. § 60-3.060(1)(g)(1). Under the modified burden-shifting analysis applicable to failure to accommodate claims,[11] Mitchell must make a facial showing that (1) he "has an ADA disability," (2) "is a qualified individual" under the ADA; (3) "suffered [an] adverse employment action," and (4) "a reasonable accommodation is possible." *Brannon v. Luco Mop. Co.*, 52 F.3d 843, 848 (8th Cir. 2008) (citing *id.*). If an employee makes this *prima facie* showing, then the burden shifts to the employer to show it is unable to accommodate the employee through he proposed accommodation. *Id.*

With respect to the fourth element of this *prima facie* claim,[12] Defendants appear to argue that a reasonable accommodation of light duty work was not possible because they allegedly had no such

---

[11] Failure to accommodate claims are not analyzed under the *McDonnell Douglas* burden shifting analysis, because in failure to accommodate cases, "the 'discrimination' is framed in terms of the failure to fulfill an affirmative duty – the failure to reasonably accommodate the disabled individual's limitations." *Id.* at 766-767. Instead, a "modified" burden-shifting analysis applies to these claims. *Brunckhorst v. City of Oak Park Heights*, 914 F.3d 1177, 1182 (8th Cir. 2019) (citing *Fenney v. Dakota, Minn. & E.R.R. Co.*, 327 F.3d 707, 712 (8th Cir. 2003).

[12] For purposes of brevity and efficiency, with respect to the first two elements of his prima facie showing, Mitchell incorporates by reference the arguments and authorities stated in Sections IV(A)(1)-(2) (that he has a disability as defined by the ADAAA and/or MHRA and is a qualified individual under both statutes). For the third element of his claim, it is undisputed that Mitchell suffered an adverse employment action when Defendants terminated his employment. *See* DSOF ¶ 57; Plf.'s Response to DSOF ¶ 57.

13

work available at the time Mitchell was subject to work restrictions. In support of this argument, Defendants also cite Mitchell's supposed "admission" that he did not request any accommodation for his alleged disability, as well as Plaintiff's testimony that there was purportedly only one accommodation available to him during his work restrictions—light duty work—which Defendants did not have available at that time (*see* DSOF ¶¶ 43,44, 48). Defendants' arguments fail because they attempt to rely on legal conclusions which they have improperly attempted to couch as "facts."[13] And there is a disputed issue of fact as to this issue; Mitchell also testified he requested light duty work during his conversation with Melvin, and could have performed the essential functions of his position with that accommodation. Plf.'s Response to DSOF ¶ 48.

### E. Defendants are Not Entitled to Summary Judgment on Mitchell's ADAAA Retaliation Claim

To demonstrate a *prima facie* retaliation claim under the ADAAA,[14] Mitchell must show: (1) he engaged in statutorily protected activity; (2) the employer took an adverse action against him, and (3) a causal connection exists between the adverse action and the protected activity. *Canning v. Creighton Univ.*, 995 F.3d 603, 615 (8th Cir. 2021). Requesting an accommodation is a protected activity under the ADAAA. *Heisle*r, 339 F.3d at 632. Importantly, even if the Court ultimately concludes Mitchell was not disabled as defined by the ADAAA, and thereby not entitled to an accommodation, he can still succeed on his retaliation claim under that statute so long as he can show he "had a good faith belief that the requested accommodation was appropriate." *Id.* at 630 n. 5, 632.

---

[13] *See e.g. Hervey v. Mo. Dep't of Corrections*, 379 S.W.3d 156, 160 (Mo. 2012) (holding defendant's attempt to use the plaintiff's testimony to establish a legal conclusion is improper, as a plaintiff alleging disability discrimination is required to prove he "is legally disabled"); *Hoffmeier v. Civil Service Comm'n*, 541 S.W.3d 8, 12 (Mo. App. E.D. 2017) (stating that testimony to a legal conclusion by a party "has no probative force, and therefore, is not substantial evidence"); *Metropolitan Nat'l Bank v. Commonwealth Land Title Ins. Co.*, 456 S.W.3d 61, 66 (Mo. App. S.D. 2015) ("A legal conclusion brandished as a statement of fact must be disregarded in evaluating a motion for summary judgment").

[14] A retaliation claim under the ADAAA "follows the same direct evidence or burden-shifting analysis employed in discrimination claims." Oehmke v. Medtronic, Inc., 844 F.3d 748, 758 (8th Cir. 2016) (internal citations omitted). Accordingly, for brevity and efficiency purposes, Mitchell incorporates his pretext arguments from Section IV(C) here as well.

A request for accommodation does not need to be in writing or use the words "reasonable accommodation" specifically, but the employee "must make clear that that the employee wants assistance for…[his] disability." *Powley v. Rail Crew Xpress, LLC*, 25 F.4th 610, 612 (8th. Cir. 2022). The employee is required only to "provide the employer with enough information that, under the circumstances, the employer can be fairly said to know of both the disability and desire for an accommodation." *Kowitz v. Trinity Health*, 839 F.3d 742, 748 (8th Cir. 2016).[15] Here, Plaintiff engaged in a protected activity by requesting the reasonable accommodation of "light duty" work which would comply with his temporary restrictions (Plf.'s Response to DSOF ¶ 43); when he was told such work was not available (Plf's Response to DSOF ¶44) by then requesting an accommodation of a temporary medical leave of absence/time off work while he received treatment for his injury. (Plf.'s Response to DSOF ¶ 51). *See Schweitzer v. Preferred Family Healthcare, Inc*, 2021 WL 5496081(W.D. Mo. Nov. 23, 2021)(noting courts have found that a plaintiff requesting time off of work for medical reasons could be a reasonable accommodation). And as stated in Section IV.A., given the close temporal proximity between Mitchell's request for a reasonable accommodation and his termination—which is even closer between his text to Melvin indicating he needed to be off work until his next appointment and Melvin's response terminating him (*see* Plf. Response to DSOF ¶ 51), there is evidence of causal connection between Mitchell's good faith requests for accommodations and his subsequent termination.

## V. CONCLUSION

For all of the foregoing reasons, Mitchell respectfully requests the Court deny Defendants Motion for Summary Judgment.

---

[15] Indeed, the Eighth Circuit has found a reasonable jury could conclude a plaintiff who "never used the word accommodation" but had advised her supervisor about her medical conditions and had "repeatedly inquired about a leave of absence to deal with them" had requested an accommodation. *Garrison v. DolgenCorp, LLC*, 939 F.3d 937, 941 (8th Cir. 2019) (quoting 29 C.F.R. § 1630.2(o)(1)(ii)) ((A reasonable accommodation is defined as "[m]odifications or adjustments to the work environment, or to the manner or circumstances under which the position held or desired is customarily performed, that enable an individual with a disability who is qualified to perform the essential functions of that position[.]")

15

## CERTIFICATE OF SERVICE

I hereby certify that on February 12, 2024, the foregoing was filed electronically using the court's electronic filing system which will send notice to all counsel of record in this case.

/s/ *M. Katherine Paulus*
COUNSEL FOR PLAINTIFF