## IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF MISSOURI
## WESTERN DIVISION

| | | |
|---|---|---|
| **RICHARD MITCHELL,** | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | |
| | ) | Case No. 4:23-CV-00138-GAF |
| **THE DIEZ GROUP, LLC** | ) | |
| **d/b/a DIEZ GROUP,** | ) | Hon. Gary A. Fenner |
| | ) | |
| and | ) | |
| | ) | |
| **THE DIEZ GROUP KANSAS CITY,** | ) | |
| **LLC d/b/a DELACO STEEL KANSAS** | ) | |
| **CITY,** | ) | |
| | ) | |
| Defendants. | ) | |

## DEFENDANTS' REPLY SUGGESTIONS IN SUPPORT OF
## THEIR MOTION FOR SUMMARY JUDGMENT

**Table of Contents**

Introduction ............................................................................................................................. 1

Defendants' Response to Plaintiff's Additional Statements of Material Fact ............................. 1

Argument ................................................................................................................................ 10

I.      Mitchell has not offered proof that he was disabled, so all his disability
discrimination claims (Counts II-III and V-VII) fail at the threshold. ............................ 10

II.     Mitchell has no proof he was terminated due to his "disability," which would also
warrant summary judgment on Counts II and V ............................................................ 12

III.    Mitchell admits his disability was accommodated, thereby conceding his failure-
to-accommodate claims (Counts III and VII). ............................................................... 16

IV.    Mitchell's disability retaliation claim (Count IV) fails due to a lack of causation
and pretext evidence. .................................................................................................... 17

V.     Mitchell's workers' compensation retaliation claim (Count I) fails for similar
reasons ......................................................................................................................... 17

Conclusion ............................................................................................................................. 19

Case 4:23-cv-00138-GAF   Document 45   Filed 03/04/24   Page 2 of 24

## Table of Authorities

**Cases**

*Alley v. Foley Indus. Inc.*,
    2021 WL 5999266 (W.D. Mo. Dec. 20, 2021) ...................................................... 14

*Aucutt v. Six Flags Over Mid-Am., Inc.*,
    85 F.3d 1311 (8th Cir. 1996) .................................................................................. 12

*Boston v. TrialCard, Inc.*,
    75 F.4th 861 (8th Cir. 2023) .................................................................................. 18

*Brearey v. Brennan*,
    2019 WL 111037 (E.D. Pa. Jan. 4, 2019) ............................................................. 11

*Canning v. Creighton Univ.*,
    995 F.3d 603 (8th Cir. 2021) .................................................................................. 12

*Denn v. CSL Plasma, Inc.*,
    816 F.3d 1027 (8th Cir. 2016) ................................................................................ 18

*Dipinto v. Westchester Cnty.*,
    2023 WL 1438721 (S.D.N.Y. Feb. 1, 2023) .......................................................... 11

*Garcia v. Salvation Army*,
    918 F.3d 997 (9th Cir. 2019) .................................................................................. 11

*Hustvet v. Allina Health Sys.*,
    910 F.3d 399 (8th Cir. 2018) .................................................................................. 11

*Jacobsen v. Phelps Memorial Health Ctr.*,
    No. 8:13-cv-00360, slip op. at 13 (D. Neb. Oct. 14, 2015) ................................... 18

*Jones v. United Parcel Serv., Inc.*,
    2005 WL 1009572 (W.D. Mo. Apr. 7, 2005) ....................................................... 12

*Lorenzen v. GKN Armstrong Wheels, Inc.*,
    345 F. Supp. 2d 977 (N.D. Iowa 2004) ................................................................. 12

*McNary v. Schreiber Foods, Inc.*,
    535 F.3d 765 (8th Cir. 2008) .................................................................................. 15

*Nemec v. Wal-Mart Assocs., Inc.*,
    2015 WL 8492040 (D. Minn. Dec. 10, 2015) ....................................................... 18

*Pulczinski v. Trinity Structural Towers, Inc.*,
    691 F.3d 996 (8th Cir. 2012) .................................................................................. 15

*Ragusa v. Malverne Union Free Sch. Dist.*,
    381 F. App'x 85 (2d Cir. 2010) ........................................................ 11

*Reed v. City of St. Charles*,
    561 F.3d 788 (8th Cir. 2009) .......................................................... 11

*Reeves v. Sanderson Plumbing Prod., Inc.*,
    530 U.S. 133 (2000).................................................................. 14, 16

*Richey v. City of Independence*,
    540 F.3d 779 (8th Cir. 2008) .......................................................... 15

*Robinson v. Am. Red Cross*,
    753 F.3d 749 (8th Cir. 2014) .......................................................... 12

*Rothmeier v. Inv. Advisers, Inc.*,
    85 F.3d 1328 (8th Cir. 1996) ..................................................... 13, 16

*Satcher v. Univ. of Ark. at Pine Bluff Bd. of Trs.*,
    558 F.3d 731 (8th Cir. 2009) .......................................................... 12

*Smith v. Allen Health Sys.*,
    302 F.3d 827 (8th Cir. 2002) .......................................................... 13

*Wells v. SCI Mgmt., L.P.*,
    469 F.3d 697 (8th Cir. 2006) .......................................................... 18

**Introduction**

Mitchell has no legitimate basis to dispute that, by late May 2022, he was not living up to Diez's expectations. His supervisor was unhappy with his performance, he had already reached the maximum number of allowed absences less than a month into his 90-day probationary period, and he did not comply with company policy requiring immediate reporting of workplace injuries. Unable to rebut these facts with affirmative evidence of his own, Mitchell's opposition to summary judgment instead seeks to deflect with lawyer's argument, quibbling with the applicable policies and arguing that his employer's (uncontroverted) concerns were overblown or exaggerated. But he offers no actual evidence to show that Diez's interpretations of its own policies were wrong or that his supervisors' concerns were not honestly held.

In responding this way, Mitchell fundamentally disregards his obligations at the summary judgment stage. It is *his* obligation to cite significantly probative evidence of each element of his claims, including evidence that would allow a jury to find that Diez's stated reasons for his termination were false *and* a pretext for discrimination. Mitchell lacks proof of his claims, and his arguments that *Diez* somehow did not undermine his unsupported theories and bare conclusory allegations of wrongdoing are insufficient. The Court should grant summary judgment.

**Defendants' Response to Plaintiff's Additional Statements of Material Fact**

1.      Vestal testified Mitchell did not demonstrate the type of mechanical, technical, or electrical knowledge he would have expected to see given the job experience Vestal recalls Mitchell listing on his resume. Ex. 1, Vestal Depo. at 15:7-19.

**Response:** Controverted but immaterial. Paragraph 1 mischaracterizes the cited testimony. Mitchell's counsel asked Vestal if "there were any other areas of knowledge that [he] felt Mr. Mitchell was lacking in" and Vestal responded that Mitchell lacked knowledge about the

mechanical, technical, and electrical aspects of maintenance. (Ex. 1, Vestal Dep. 15:7-17.) Vestal then added that Mitchell's level of knowledge was inconsistent with the work history listed on Mitchell's resume. (*Id.* at 15:18-19.) Regardless, this testimony does not create a genuine dispute of material fact about whether the relevant decisionmaker, Hunt, had an honest belief that Mitchell was a poor performer.

2.    Vestal testified that Mitchell's resume indicated Mitchell had a Bachelor's degree in science and associated science from Purdue, and had prior work experience: at General Electric Aviation and for Toyota Logistics Service, as a quality engineer at Kaizen, as a production and rail supervisor, and through serving in the United States Army and Coast Guard as an aviation machinist. Ex. 1, Vestal Depo. at 15:20-16:10.

**Response:** Uncontroverted but immaterial. This testimony does not create a genuine dispute of material fact about whether the relevant decisionmaker, Hunt, had an honest belief that Mitchell was a poor performer.

3.    Defendants' counsel introduced Mitchell's alleged resume reflecting the work experience, military service, and educational background Vestal referenced in his testimony as Exhibit 4 to Vestal's deposition. Ex. 1, Vestal Depo. at 45:6-17; Ex. 8, Mitchell Declaration at ¶ 5; Exhibit B to Ex. 8 (Alleged Resume for Mitchell/Exhibit 4 to Vestal's Deposition).

**Response:** Uncontroverted but immaterial. Paragraph 3 does not create a genuine dispute of material fact about whether the relevant decisionmaker, Hunt, had an honest belief that Mitchell was a poor performer.

4.       This was not the resume that Mitchell actually gave to Defendants when he applied for employment with them. (Ex. 8, Mitchell Declaration at ¶ 5; Exhibit A to Ex. 8 (Mitchell's Actual Resume).

**Response:**  Controverted but immaterial. Vestal testified that Exhibit 4 to his deposition was the resume that Mitchell submitted to Diez. (Ex. 1, Vestal Dep. 45:14-17.) Regardless, any alleged confusion over the resume that Mitchell submitted when he applied to Diez does not create a genuine dispute of material fact about whether the relevant decisionmaker, Hunt, had an honest belief that Mitchell was a poor performer.

5.       Mitchell did not prepare the resume introduced as Exhibit 4 to Vestal's deposition; he had never previously seen the document until a copy was provided to him during this lawsuit. *Id*. at ¶¶ 5-6.

**Response:**  Uncontroverted but immaterial. Vestal testified that Exhibit 4 to his deposition was the resume that Mitchell submitted to Diez (Ex. 1, Vestal Dep. 45:14-17), so it was reasonable for Diez to believe that Mitchell had prepared it. Furthermore, any alleged confusion over the resume that Mitchell submitted when he applied to Diez does not create a genuine dispute of material fact about whether the relevant decisionmaker, Hunt, had an honest belief that Mitchell was a poor performer.

6.       Mitchell did not hold any of the positions listed on that resume, did not serve as an aviation machinist in the United States Army or Coast Guard, and did not attend Purdue University. *Id*. at ¶ 9.

**Response:**  Uncontroverted but immaterial. Vestal testified that Exhibit 4 to his deposition was the resume that Mitchell submitted to Diez (Ex. 1, Vestal Dep. 45:14-17), so it was reasonable for Diez to believe that Mitchell possessed the experience listed on it. Furthermore, any alleged

confusion over the resume that Mitchell submitted when he applied to Diez does not create a genuine dispute of material fact about whether the relevant decisionmaker, Hunt, had an honest belief that Mitchell was a poor performer.

7.     Mitchell never lived at the address in Osceola, Indiana that was listed on that resume. Ex. 8, Mitchell Declaration at ¶ 7.

**Response:**  Uncontroverted but immaterial. Vestal testified that Exhibit 4 to his deposition was the resume that Mitchell submitted to Diez (Ex. 1, Vestal Dep. 45:14-17), so it was reasonable for Diez to believe that Mitchell had lived in Osceola, Indiana. Furthermore, any alleged confusion over the resume that Mitchell submitted when he applied to Diez does not create a genuine dispute of material fact about whether the relevant decisionmaker, Hunt, had an honest belief that Mitchell was a poor performer.

8.     Mitchell never had the phone number or email address listed on that resume. Ex. 8, Mitchell Declaration at ¶ 8.

**Response:**  Uncontroverted but immaterial. Vestal testified that Exhibit 4 to his deposition was the resume that Mitchell submitted to Diez (Ex. 1, Vestal Dep. 45:14-17), so it was reasonable for Diez to believe that Mitchell had provided an accurate phone number and email. Furthermore, any alleged confusion over the resume that Mitchell submitted when he applied to Diez does not create a genuine dispute of material fact about whether the relevant decisionmaker, Hunt, had an honest belief that Mitchell was a poor performer.

9.     While Mitchell took the maintenance test on May 16, 2022, Vestal told him that others would be taking the maintenance test the next day. Ex. 8, Mitchell Declaration at ¶ 11.

**Response:**  Controverted but immaterial. Vestal testified that he had, at an unspecified date, administered the test to Michael Doureing and Mitch Gruis, but did not testify that he told

Mitchell that other employees would be taking the test the next day. (Ex. 1, Vestal Dep. 50:18-51:2; *see generally id.*) Regardless of whether or when other employees took the test, it is undisputed that Mitchell took the test and scored 43% on it. (Ex. I; Pl.'s Resp. to Facts ¶¶ 23-24.) Mitchell's failing score was further evidence that he lacked the skills and knowledge needed to perform the Maintenance Technician role and served as a good faith basis for Diez to conclude that he was a poor performer. Moreover, Vestal testified that besides Mitchell, no Maintenance Technician has ever failed the test (Ex. 1, Vestal Dep. 52:6-9), so Mitchell cannot (and does not) argue that he was treated differently than other, similarly-situated Maintenance Technicians. (*See generally* Pl.'s Suggs. in Opp'n to Defs.' Mot. for Summ. J., ECF No. 44 ("Pl.'s Opp.").)

10.     Vestal told Mitchell that the maintenance test was not a pass or fail type test. Ex. 8, Mitchell Declaration at ¶ 19.

**Response:** Controverted but immaterial. Vestal testified that, after the test was scored, he informed Mitchell that he had not passed the test. (Ex. 1, Vestal Dep. 52:1-15.) Regardless of what Vestal told Mitchell, it is undisputed that Mitchell took the test and scored 43% on it. (Ex. I; Pl.'s Resp. to Facts ¶¶ 23-24.) Mitchell's score was further evidence that he lacked the skills and knowledge needed to perform the Maintenance Technician role and served as a good faith basis for Diez to conclude that he was a poor performer.

11. The position statement Defendants submitted to the EEOC in response to Mitchell's Charge of Discrimination indicated that "*after learning* [ ] that [Mitchell], in addition to all of his other performance problems and attendance violations, had violated Company rules by failing to report alleged work-related injury as required, *Mr. Vestal* made the decision to discharge [Mitchell] for failing to meet Company requirements during his introductory period." Ex. 9, Position Statement, Defendant's Document Production 286-289 (emphasis added).

**Response:** Uncontroverted but immaterial. Diez's proffered reasons for Mitchell's termination have remained consistent both before and throughout this litigation. (*Compare* Ex. 9 *with* Ex. Q.) Moreover, it is uncontroverted that Vestal recommended that Hunt terminate Mitchell, and that Hunt followed through on Vestal's recommendation. (*See* Pl.'s Resp. to Facts ¶¶ 28, 55.) Mitchell is quibbling with what was, in effect, Diez's counsel's shorthand description of the decisional process, and one contained solely in lawyer-drafted documents rather than the evidence.

12.     But Vestal testified he did not become aware of any purported confusion regarding the date that Mitchell was actually injured until after he had already been informed that Mitchell was terminated. Ex. 1, Vestal Depo. at 44:4-23.

**Response:** Controverted but immaterial. Vestal testified that he could not recall whether he learned about the uncertainty regarding the date of Mitchell's injury before or after he learned that Mitchell had been terminated. (Ex. 1, Vestal Dep. 44:22-23.) Regardless, the cited testimony does not create a genuine dispute of material fact about whether the relevant decisionmaker, Hunt, had an honest belief that Mitchell had violated company policy. Nor does it create a genuine dispute regarding the fact that Vestal had previously recommended termination to Hunt based on poor performance and attendance.

13.     Melvin initially testified that she did not know whether Hunt or Vestal made the ultimate termination decision, but then later said that it was Hunt who made the decision. Ex. 4, Melvin Depo. at 46:11-14; 50:10-19.

**Response:** Uncontroverted.

14.     The "essential functions" of the Maintenance Technician position are listed in the job description for that position as follows:

- Perform maintenance jobs in accordance with the highest standards of efficiency

- Participate in continuous improvement projects Adhere to ISO 14001 and 1ATF 16949

- procedures and work instructions.

- Maintain the smooth running of the building facilities to include repairs, lighting, electrical systems, maintain plumbing system, alarm system, fire extinguishers. HV AC,

- Maintain the smooth running of the grounds.

- Maintain the smooth running of all production equipment within the plant

- Other duties as assigned by the Maintenance Manager.

Doc. 36-7 (Maintenance Technician Job Description); Ex. 7, Defendants' Interrogatory Answers at Answer to No. 16. (identifying the job description in their answer to an interrogatory requesting that Defendants identify the essential functions of the Maintenance Technician position that Mitchell held).

**Response:** Uncontroverted but incomplete and immaterial. The job description for the Maintenance Technician later describes physical demands that "are representative of those essential functions that must be successfully performed," including "frequently lift[ing] and/or mov[ing] items over 50 pounds." (Ex. F at 2.) Regardless, for purposes of summary judgment, Diez does not dispute that Mitchell was able to perform the essential functions of his job with or without reasonable accommodation.

11.    At some point, Melvin notified Defendants' workers' compensation insurance company that Mitchell's employment had been terminated. Ex. 4, Melvin Depo. at 51:20-52:4.

**Response:** Uncontroverted.

12.    In an August 22, 2022 email, the insurance company examiner assigned to Mitchell's worker's compensation claim sent an email to Melvin indicating Mitchell was "fired due to productivity effective 5/23/222" and that Mitchell "wasn't completing his assigned tasks

during his shift." Exhibit 10, Email from Santiago to Melvin at Defendant's Document Production 234-235.

     **Response:** Controverted but immaterial. The email in Exhibit 10 is dated July 19, 2022, not August 22, 2022. (Ex. 10.) Regardless, the insurance adjuster's notes about why Mitchell was terminated do not create a genuine dispute of material fact about Diez's proffered reasons for Mitchell's termination, as they are entirely consistent with the performance deficiencies that Diez identified. And the non-party insurance adjuster's understanding of the reasons for Mitchell's termination does not create a genuine dispute about Hunt's motivations for terminating Mitchell.

     13.    In connection with their Interrogatory Answers, Defendants produced a chart indicating there were sixteen total Workers' Compensation claims filed against it by a total of fifteen employees at the same location where Mitchell worked during the time period of 2021-2023; that chart reflects Mitchell was terminated on May 23, 2022 for the reason of "attendance." Ex. 7, Defendants' Interrogatory Answers at Answer to No. 3 and Exhibit A to same.

     **Response:** Uncontroverted but immaterial. Mitchell's termination was motivated, in part, by his poor attendance record (*see* Ex. Q) and, in response to an interrogatory asking Diez to identify the reasons for Mitchell's termination, Diez stated that Mitchell was terminated "because of his attendance, poor performance, and multiple rules violations, including his failure immediately to report an injury to management as required and conflicting response as to the date the injury occurred." (Ex. 7 at 4.) Thus, the shorthand notation on the chart does not create a genuine dispute of material fact about Diez's proffered reasons for Mitchell's termination.

     14.    All but one of the 15 employees identified in the chart Defendants provided in answer to Interrogatory Number 3 have been involuntarily terminated from their employment with the company; nine of them were terminated within two months or less of the date of their injury

claim, and of those, five were terminated less than one month after the date of their injury claim. *Id*.

**Response:** Uncontroverted but immaterial. Besides temporal proximity, Mitchell has not offered any evidence that the other employees listed in the chart were terminated in retaliation for seeking workers' compensation benefits. And, in any event, Mitchell has not and cannot establish that the other employees were similarly situated to him.

15. On the Physical Demands form for the Maintenance Technician that Melvin completed and provided to Defendants' workers' compensation insurance provider, she indicated the position required employees to spend zero hours at one time moving items weighing more than 10 pounds; a half hour or less at one time kneeling or squatting; a half hour to an hour at one time sitting, bending or twisting at the waist; and indicated the position requires a total of 6-8 hours per day of walking. Ex. 11, Physical Demands Form (Defendant's Document Production 209).

**Response:** Uncontroverted but immaterial. For purposes of summary judgment, Diez does not dispute that Mitchell was able to perform the essential functions of his job with or without reasonable accommodation.

16. Melvin testified that after learning of Mitchell's injury, she called Mike Berry (the Vice President in charge of their location) who instructed Melvin to deny Mitchell's workers' compensation claim. Ex. 4, Melvin Depo. at 37:2-38:11.

**Response:** Uncontroverted but immaterial. Hunt, not Berry, decided to terminate Mitchell and Mitchell has not cited any evidence that Hunt was even aware of Berry's comment, let alone significantly influenced by it. Berry's comment thus does not create a genuine dispute of material fact about Hunt's motivations for terminating Mitchell.

17. The First Report of Injury form-which Melvin testified was prepared by Defendants' workers' compensation insurance company using information Melvin provided to them-is devoid of any reference to Mitchell providing conflicting information about the timing of his injury, and also indicates Mitchell's injury occurred on May 18, 2022. Ex. 4 Melvin Depo. at 41:3-43:12; Ex. 12, First Report of Injury Form (Exhibit 7 to Melvin Depo.)

**Response:** Uncontroverted but immaterial. The non-party insurance company's record of Mitchell's injury does not create a genuine dispute of material fact about whether the relevant decisionmaker, Hunt, honestly believed that Mitchell had violated company policy by failing to immediately report his injury.

### Argument

## I. Mitchell has not offered proof that he was disabled, so all his disability discrimination claims (Counts II-III and V-VII) fail at the threshold.

At the outset, Mitchell has failed to rebut Diez's argument that he is not even "disabled" under the ADA and MHRA, and that his disability claims thus fail at the threshold. (*See* Defs.' Suggs. in Supp. of Their Mot. for Summ. J. 9-12, ECF No. 36-1 ("Defs.' Suggs.").) He offers only two arguments (disability and "regarded as" disability). But he has no proof of either.

**A.** **Mitchell is not disabled.** *First*, Mitchell was not "disabled" as a matter of law. Mitchell ignores Diez's authority confirming that temporary impairments are not disabilities (Defs.' Suggs. at 10) and does not offer a single case from any jurisdiction supporting the notion that a three-week shoulder strain reflects a "disability" under either federal or state law. (*See generally* Pl.'s Opp.) Instead, all Mitchell points to is his own testimony that he cannot work "at a hundred percent." (*Id*. at 6.)

That is not enough. A plaintiff's self-serving testimony, unsupported by medical proof, is insufficient to prove that his injury rises to the level of a disability. *E.g.*, *Brearey v. Brennan*, 2019

WL 111037, *6 (E.D. Pa. Jan. 4, 2019) (employee's broken ankle caused only "several months of limitations, without long-term or permanent effect" despite plaintiff's testimony that he had continued pain); *Dipinto v. Westchester Cnty.*, 2023 WL 1438721, at *6 (S.D.N.Y. Feb. 1, 2023) (plaintiff's testimony insufficient to show disability without supporting medical evidence); *Ragusa v. Malverne Union Free Sch. Dist.*, 381 F. App'x 85, 87-88 (2d Cir. 2010) (plaintiff did not show disability when "the record contain[ed] no medical evidence other than a doctor's note clearing Ragusa to return to work following her surgery").

By contrast, the unrebutted proof that Mitchell's medical provider released him to work three weeks after the injury establishes that the injury was temporary and not a disability. Pl.'s Resp. to Facts ¶ 52; *cf.*, *e.g., Garcia v. Salvation Army*, 918 F.3d 997, 1010 (9th Cir. 2019) ("A doctor's release to work without restrictions supports a finding that a person no longer suffers from a 'disability'"). So too does the fact that Mitchell has not sought medical treatment for his shoulder since he was cleared to work. Pl.'s Resp. to Facts ¶ 53; *cf. Hustvet v. Allina Health Sys.*, 910 F.3d 399, 411 (8th Cir. 2018) (plaintiff not disabled when she had never been hospitalized, sought "significant medical attention," or taken prescription medicine for her alleged condition). Mitchell's conclusory assertion that his three-week shoulder strain represents a "substantial limitation" (Pl.'s Opp. at 5-6) does not raise a genuine issue of material fact. *Reed v. City of St. Charles,* 561 F.3d 788, 790-91 (8th Cir. 2009) ("A plaintiff may not merely point to unsupported self-serving allegations but must substantiate his allegations with sufficient probative evidence that would permit a finding in his favor…") (cleaned up).

**B.     Mitchell was not regarded as disabled.** Mitchell's attempt to save his claims with a "regarded-as" theory also fails. *First*, as Diez argued, a "regarded-as" disability theory does not

apply to temporary impairments. (Defs.' Suggs. at 11-12.) As discussed above, Mitchell has not offered probative evidence to show that his three-week strain was more than temporary.

*Second*, Mitchell's brief does not address the second element of a regarded-as claim: that his "*employer* mistakenly believes" that he is disabled. *Canning v. Creighton Univ.*, 995 F.3d 603, 615 (8th Cir. 2021) (emphasis added); *see also Aucutt v. Six Flags Over Mid-Am., Inc.*, 85 F.3d 1311, 1320 (8th Cir. 1996) (employer's mere awareness of employee's medical problems does not establish that the employer regarded the employee as disabled); *Lorenzen v. GKN Armstrong Wheels, Inc.*, 345 F. Supp. 2d 977, 991 (N.D. Iowa 2004) ("Nor does an employer regard an employee as disabled simply by reasonably relying on restrictions imposed by a treating physician."). Given that Mitchell does not even argue—let alone offer proof—that Diez viewed his shoulder strain as a disability, he cannot prove a regarded-as claim.[1]

## II.  Mitchell has no proof he was terminated due to his "disability," which would also warrant summary judgment on Counts II and V.

Even if Mitchell were disabled, he still cannot show that Diez's reasons for terminating him were both (1) false *and* (2) pretext for discrimination. Mitchell, notably, ignores his dual obligation here, focusing solely on falsity. (*See* Pl.'s Opp. at 8-13.) That alone warrants summary judgment, as "[s]imply creating a factual dispute as to the veracity of the defendant's proffered explanation for the adverse employment action is insufficient to avoid summary judgment." *Jones v. United Parcel Serv., Inc.*, 2005 WL 1009572, at *18 (W.D. Mo. Apr. 7, 2005) (Fenner, J.). Mitchell must also point to evidence that would allow a reasonable jury to conclude that Diez

---

[1] Mitchell does not argue that he had a record of being disabled and has thus abandoned that claim. *See, e.g., Robinson v. Am. Red Cross*, 753 F.3d 749, 754 (8th Cir. 2014) (plaintiff waived claims by failing to oppose employer's motion for summary judgment on those claims); *Satcher v. Univ. of Ark. at Pine Bluff Bd. of Trs.*, 558 F.3d 731, 735 (8th Cir. 2009) ("failure to oppose a basis for summary judgment constitutes waiver of that argument").

intentionally discriminated against him because of his alleged disability. *Rothmeier v. Inv. Advisers, Inc.*, 85 F.3d 1328, 1337 (8th Cir. 1996). But he does not offer any evidence showing discriminatory animus: no negative comments about his injury, no non-disabled peers who received better treatment, no arbitrary or inconsistent applications of company policy, or anything else. (*See generally* Pl.'s Opp.) That is fatal to his discrimination claims.

In any event, Mitchell has no material evidence of falsity either. He first tries to claim that Diez's "reasons or explanations for the termination decision have shifted over time." (*Id.* at 8.) But Mitchell cannot point to any inconsistency. Diez terminated Mitchell for three reasons: (1) his poor performance and lack of skills; (2) his spotty attendance record; and (3) its belief that Mitchell violated company policy by failing to timely report his injury. (Facts ¶ 56.) True to that explanation, the paperwork completed at the time of Mitchell's discharge reflects that he was fired because (1) he had an "Unsatisfactory Probationary Period"; (2) he had "Excessive Absences/Tardiness"; and (3) he had "violat[ed] co standards #21," which states that "failure to report a work related…injury…in a timely manner" is a dismissible offense.[2] (Ex. Q; Ex. D at 46.) And Mitchell himself concedes that "Unsatisfactory Probationary Period" encompasses his performance issues, but suggests (without authority) that the paperwork's alleged "vagueness" somehow creates an inconsistency. (Pl.'s Opp. at 9.) This argument makes no sense. There has been no "substantial change[] over time" in Diez's proffered justification, as would be required to raise a material dispute over falsity. *Smith v. Allen Health Sys.*, 302 F.3d 827, 835 (8th Cir. 2002) (even "slight elaboration" of reason given for plaintiff's termination does not prove pretext).

---

[2] Diez's EEOC position statement and discovery answers are also consistent. (*See* Ex. 7 at 4; Ex. 9 at 3.)

Mitchell likewise tries to suggest shifting explanations by claiming that Diez was not consistent in identifying the decisionmaker, citing *Alley v. Foley Industries Inc.*, 2021 WL 5999266 (W.D. Mo. Dec. 20, 2021). (Pl.'s Opp. at 8, 10.) *Alley* is inapposite. In *Alley*, each of the alleged decisionmakers disclaimed responsibility for the decision to terminate Alley at their depositions. 2021 WL 5999266 at *7–8. Mitchell, however, never deposed Hunt and Hunt has never denied that he decided to dismiss Mitchell. This is not a case where "no one [] want[ed] to accept responsibility" for the adverse action. *Id*. at *7. Rather, it is uncontroverted that Vestal recommended that Hunt terminate Mitchell and that Hunt followed through on Vestal's recommendation. (*See* Pl.'s Resp. to Facts ¶¶ 28, 55.) Mitchell's reliance on what was—in effect— Diez's counsel's shorthand description of the decisional process in its lawyer-drafted documents does not create a genuine dispute of material fact on pretext.

In any event, *Alley* did not hold that mere inconsistency in identifying a decisionmaker is enough to show falsity (or pretext). Rather, in *Alley*, there was more: evidence that the plaintiff was a satisfactory performer; that the defendant was lax in enforcing its company policies; that the defendant had treated an employee who engaged in similar misconduct more leniently; and that, after discovering evidence of the plaintiff's misconduct, the defendant abandoned its investigation into the cause of the plaintiff's workplace injury. *Id*. at *4-8. Mitchell has not pointed to any similar evidence. (*See generally* Pl.'s Opp.) Regardless of the decisionmaker, the *reasons* for Mitchell's termination have always been consistent. And Mitchell has no proof that the reasons are false.

Instead, Mitchell tries to argue—inconsistent with the burden of proof—that Diez has not adequately proven that he was a poor performer. (Pl.'s Opp. at 10-11). This ignores that Diez's burden is only to *articulate* a legitimate, non-discriminatory reason for Mitchell's discharge, not *prove* it. *See Reeves v. Sanderson Plumbing Prod., Inc*., 530 U.S. 133, 142 (2000) ("This burden

is one of production, not persuasion; it 'can involve no credibility assessment.'") (citation omitted). Furthermore, his complaints ring hollow. Mitchell's primary argument is that Vestal's deposition testimony is not enough to prove poor performance. (Pl.'s Opp. at 10-11.) That nonsensical argument aside (who else would be in a better position to assess Mitchell's performance but his supervisor?), Diez cited to plenty of evidence confirming that Mitchell did not meet performance expectations, including an April 18, 2022 performance report documenting "unacceptable" performance (Ex. G); notes from an April 19, 2022 meeting between Mitchell, Vestal, Hunt, and Melvin regarding Mitchell's performance issues (Ex. H); and Mitchell's score of 43% on a basic maintenance skills test, itself required by Diez due to concerns about his performance deficiencies (Ex. I). Mitchell's burden is to point to evidence that Diez did not actually believe he had performance issues, and he has no such evidence.

Mitchell also attempts to create a falsity issue by quarreling with Diez's interpretation of its own attendance policy, claiming that Diez should have considered one absence excused and incorrectly classified an early departure as a "no call/no show." (Pl.'s Opp. at 11-12; Pl.'s Resp. to Facts ¶¶ 25-26.) But an employee cannot create an issue of pretext by merely disagreeing with how his employer interprets its own policy. *E.g.*, *Richey v. City of Independence*, 540 F.3d 779, 786 (8th Cir. 2008) ("It is generally for an employer to interpret its own policies…Even if the City has misapplied its own policy, moreover, that alone does not constitute evidence of discrimination."). All that matters here is that Diez "honestly believed" that Mitchell had a poor attendance record. *McNary v. Schreiber Foods, Inc.*, 535 F.3d 765, 769 (8th Cir. 2008); *Pulczinski v. Trinity Structural Towers, Inc.*, 691 F.3d 996, 1003 (8th Cir. 2012) ("A showing that the employer made a mistaken and unreasonable determination that an employee violated company rules does not prove that the employer was motivated by a known disability"). Mitchell does not dispute that

Diez's attendance policy states that new hires are allowed "two occurrences (late, leave early, or absence)" during their first 90 days of employment. (Ex. D at 41.) And Mitchell admittedly missed work on two occasions less than a month after he started at Diez. (Pl.'s Resp. to Facts ¶¶ 25-26 (admitting Mitchell left early on March 30 and April 23, 2022).) Diez thus had a good faith basis to conclude that Mitchell's attendance was spotty, and Mitchell offers nothing to show otherwise.

Finally, Mitchell protests that "there is no record evidence to support Defendants' contention that the termination decision was also motivated by '*Hunt*'s belief that Mitchell had violated company policy.'" (Pl.'s Opp. at 12 (emphasis in original).) Again, Diez only has to articulate a legitimate non-discriminatory reason for Mitchell's termination. *Reeves*, 530 U.S. at 142. It is Mitchell who must prove that Hunt was motivated by discriminatory animus.[3] *E.g., Rothmeier*, 85 F.3d at 1332 ("The plaintiff retains at all times the ultimate burden of persuading the trier of fact that the adverse employment action was motivated by intentional discrimination."). Diez disclosed Hunt as a potential witness, but Mitchell chose not to depose him. Mitchell cannot bootstrap his own discovery oversights into evidence of pretext.

### III. Mitchell admits his disability was accommodated, thereby conceding his failure-to-accommodate claims (Counts III and VII).

Mitchell concedes that Diez granted him a leave of absence at the time of his injury, *and* admits that there was no light duty work available. (Pl.'s Resp. to Facts ¶¶ 44-45.) And Mitchell does not dispute that a leave of absence is a reasonable accommodation, particularly when there is no light duty work available. (*See* Defs.' Suggs. at 17 (citing cases).) Instead, he claims only that Diez did not *disprove* that light duty work was unavailable. (Pl.'s Opp. at 14.) This, again, ignores

---

[3] Relatedly, the fact that *Melvin* did not note Mitchell's policy violation on the Incident Investigation Report does not mean that *Hunt* did not consider the violation when deciding to terminate Mitchell. (*Contra* Pl.'s Opp. at 12.)

the burden of proof. Mitchell has no evidence that light duty work was actually available and does not explain how a leave of absence would not have been a reasonable accommodation even if light duty work was available. Summary judgment is warranted on the failure-to-accommodate claims.

## IV. Mitchell's disability retaliation claim (Count IV) fails due to a lack of causation and pretext evidence.

The only argument that Mitchell offers in support of his ADA retaliation claim—beyond the pretext-related arguments addressed above—is the temporal proximity between his alleged request for an accommodation and his termination. (Pl.'s Opp. at 15.) That is a non-starter. Temporal proximity is insufficient to establish pretext, particularly when, as here, there is intervening misconduct and the employer's concerns pre-dated the plaintiff's protected activity. (Defs.' Suggs. at 19-20 (citing cases).) Mitchell cannot save his disability retaliation claim from summary judgment.

## V. Mitchell's workers' compensation retaliation claim (Count I) fails for similar reasons.

Finally, Mitchell offers three arguments as to why his workers' compensation retaliation claim should not be dismissed. None are persuasive.

*First*, he emphasizes that there is close temporal proximity between his claim for benefits and his discharge. (Pl.'s Opp. at 3.) But, as discussed, temporal proximity alone is not enough to show retaliation under Missouri's workers' compensation law. (Defs.' Suggs. at 19-20).

*Second*, Mitchell points to a statement by Diez Vice President Mike Berry indicating that Mitchell's workers' compensation claim should be denied.[4] (Pl.'s Opp. at 12.) Putting aside the logical disconnect of this argument (one's belief that a workers' compensation claim is invalid does not reflect a desire to terminate), Berry's statement is irrelevant as he was not a decisionmaker.

---

[4] Berry did not have authority to deny Mitchell's claim; Diez's workers' compensation insurer did. (*See* Ex. S.) And Mitchell's claim was approved and paid in full. (Facts ¶ 62.)

*See Wells v. SCI Mgmt., L.P.*, 469 F.3d 697, 702 (8th Cir. 2006) (stray comments "made by nondecisionmakers" that are "unrelated to the decisional process itself" are "immaterial"); *see also Denn v. CSL Plasma, Inc.*, 816 F.3d 1027, 1035 (8th Cir. 2016). Here, Hunt—not Berry—made the decision to terminate Mitchell. (Facts ¶ 55.) And Mitchell offers no evidence that Hunt even knew of Berry's comment, let alone was influenced by it. (*See generally* Pl.'s Opp.)

*Third*, Mitchell argues that Diez terminated other employees in the months after they claimed workers' compensation benefits. (Pl.'s Opp. at 12-13.) Mitchell apparently presumes that those terminations were retaliatory, and thus his termination must have been retaliatory too. But that is not how "me too" evidence works. Mitchell cannot just assume that other terminations were retaliatory; he must offer at least circumstantial evidence that the other employees were subject to retaliation. *See, e.g.*, *Boston v. TrialCard, Inc.*, 75 F.4th 861, 868 (8th Cir. 2023); *Jacobsen v. Phelps Memorial Health Ctr.*, No. 8:13-cv-00360, slip op. at 13 (D. Neb. Oct. 14, 2015) (mere list of older employees who were replaced by younger workers insufficient to show age discrimination, absent factual context that would permit a specific inference of discrimination). He offers nothing of the sort.

Further, even if Mitchell could show that *others* were subject to retaliatory terminations, he would need to show that he was similarly situated to those employees. *Boston*, 75 F.4th at 868. This would require evaluation of factors like "whether the other alleged [retaliatory] behavior is close in time to the events at issue in the plaintiff's case; whether the same decisionmakers were involved; whether the other employee and the plaintiff were treated in a similar manner; and whether the employee and the plaintiff were otherwise similarly situated." *Nemec v. Wal-Mart Assocs., Inc*, 2015 WL 8492040, at *7 (D. Minn. Dec. 10, 2015). Mitchell makes no such showing—and, if anything, his evidence suggests that other employees were not similarly situated

to him (including one employee who was terminated after refusing to take a post-accident drug test and another who simply did not show up to work). (*See* Ex. 7.) Mitchell's "me too" evidence is meaningless.

## Conclusion

The Court should enter summary judgment for Diez and dismiss all of Mitchell's claims.

Respectfully submitted,

Dated: March 4, 2024

By: */s/ Robert J. Finkel*
Robert J. Finkel (*admitted pro hac vice*)
Thomas J. Davis (*admitted pro hac vice*)
KIENBAUM HARDY
VIVIANO PELTON & FORREST, P.L.C.
280 N. Old Woodward Ave., Ste. 400
Birmingham, MI 48009
(248) 645-0000 (main)
(248) 458-4581 (fax)
rfinkel@khvpf.com
tdavis@khvpf.com

Matthew J. Westering (MO Bar No. 61134)
SEYFERTH BLUMENTHAL & HARRIS LLC
4801 Main St., Ste. 310
Kansas City, MO 64112
(816) 756-0700 Telephone
(816) 756-3700 Facsimile
matt@sbhlaw.com

**Attorneys for Defendants**

**CERTIFICATE OF SERVICE**

I hereby certify that on March 4, 2024, the foregoing was served via the Court's CM/ECF system, which sent electronic notice of the filing to all counsel of record.

/s/ Robert J. Finkel

Robert J. Finkel