IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF MISSOURI
WESTERN DIVISION

| | |
|---|---|
| RICHARD MITCHELL, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| vs. | ) Case No. 23-00138-CV-W-GAF |
| | ) |
| THE DIEZ GROUP, LLC | ) |
| d/b/a DIEZ GROUP and | ) |
| THE DIEZ GROUP KANSAS CITY, | ) |
| LLC d/b/a DELACO STEEL KANSAS | ) |
| CITY, | ) |
| | ) |
| Defendants. | ) |

**ORDER**

Now before the Court is Defendants The Diez Group, LLC d/b/a Diez Group and The Diez Group Kansas City, LLC d/b/a Delaco Steel Kansas City's (collectively "Defendants") Motion for Summary Judgment on Plaintiff Richard Mitchell's ("Plaintiff") discrimination and retaliation claims. (Doc. 36). Plaintiff opposes. (Doc. 44). Defendant has also filed a reply brief. (Doc. 45). For the following reasons, Defendants' Motion for Summary Judgment is GRANTED.[1]

**DISCUSSION**

I.  FACTS[2]

A.  **Plaintiff's Hiring**

Plaintiff was offered a full-time position of 2nd shift maintenance technician with

---

[1] Defendants filed an unopposed Motion to Stay Final Pretrial Conference and Trial on April 30, 2024. (Doc. 46). The Motion is DENIED as moot.

[2] The following acronyms are used: (1) "DSOF" for Defendants' proposed statements of facts, located at Doc. 36-1, pp. 8-15; (2) "PRDSOF" for Plaintiff's responses to Defendants' proposed statement of facts, located at Doc. 44, pp. 6-27; (3) "PSOF" for Plaintiff's proposed statement of facts, located at Doc. 44, pp. 27-31; and (4) "DRPSOF" for Defendants' responses to Plaintiff's proposed statement of facts, located at Doc. 45, pp. 5-14.

Defendants on March 23, 2022. (DSOF, ¶ 3; PRDSOF, ¶ 3; Doc. 36-3, p. 2). His offer letter informed him that he would report to Ryan Vestal, Maintenance Manager, and be subject to a 90-day probationary period beginning on the date of hire. (Doc. 36-3, p. 2). Plaintiff accepted the position and terms outlined in the letter by signature dated March 28, 2022. (*Id.*, p. 3). The second shift hours were from 4:30 p.m. to 2:30 a.m. (Doc. 36-4, 19:14-17). Among the "physical demands" of the specific position was that "[t]he employee must frequently lift and/or move items over 50 pounds." (Doc. 36-7, p. 3). Plaintiff started at his position on March 28, 2022. (DSOF, ¶ 10; PRDSOF, ¶ 10; Doc. 36-4, 20:14-16).

### B. Employee Handbook Policies

The employee handbook includes an "*Introductory Period*":

> A ninety (90) calendar day introductory period has been established for new employees. This period is to allow management sufficient time to evaluate the employee's work habits, attendance and attitude, as well as his/her ability to meet work requirements and follow safety rules. This introductory period does not affect the employee's at-will status throughout his or her employment at the Company.

(Doc. 36-5, p. 17).

Under "*Employee Safety*" the handbook provides:

> Any suspected unsafe conditions and all injuries or accidents that occur on the job must be reported <u>immediately</u> to your supervisor and the Human Resources Department. Compliance with these rules is considered a condition of employment. Therefore, it is a requirement that each supervisor make the safety of employees an integral part of his/her regular job functions. It is the responsibility of each employee to accept and follow established safety rules and procedures. Failure to report such infractions may result in disciplinary action, including termination.

(*Id.* at 27) (emphasis in original). "*Reporting Safety Issues*" directs "[i]f you or another employee are injured or have damaged something, you must contact your supervisor immediately (no later than end of shift depending on extenuating circumstances). (*Id.*).

The handbook also includes an attendance policy that provides:

2

> New Hires are subject to a ninety (90) calendar day introductory period. All absence reasons are to be reviewed with your supervisor/ Human Resources. You are allowed two (2) occurrences (late, leave early or absence) during this period. If a third occurrence happens within this ninety (90) day period, you may be discharged.

(Doc. 36-5, p. 46). The attendance policy is a point-based system, and points are accumulated for tardiness, absence, or failure to properly report an absence or tardy. (*Id.* at 47). All absences must be reported at least one hour prior to the start of the shift or earlier if possible. (*Id.*). Each properly reported absence is assessed one point, and each unreported (no call/no show) or improperly reported absence is assessed 1.5 points. (*Id.*).

### C. Plaintiff's Work Performance and Attendance Issues

Plaintiff reported to Maintenance Manager Ryan Vestal, who reported to Plant Manager Matt Hunt. (DSOF, ¶ 11; PRDSOF, ¶ 11). Vestal felt that "[a]nything that I asked [Plaintiff] to repair or do, he struggled with. Usually it entailed [Plaintiff] standing there watching somebody do it, and this happened time after time. So it's just any job that I gave [Plaintiff] to do, it was like he couldn't complete it, so." (Doc. 36-2, p. 16:17-22). On April 20, 2022, Vestal sent an email to Human Resources Sharon Melvin and Hunt detailing Plaintiff's unacceptable performance report for his April 18 shift. (Doc. 36-8, p. 2). He wrote that Plaintiff "had all the tools and training to perform his job duty yet claimed he did not have the tools to perform the job. After a 10 hour shift, Richard ran 2 10ft sticks of conduit. As a Maintenance Manager at The Diez group, this is unacceptable." (*Id.*).

Defendants gave Plaintiff a maintenance test after April 27 because his performance was not where it needed to be. (Doc. 36-2, 46:3-11). Plaintiff failed the maintenance test with a score of 43 percent. (Doc. 36-2, 46:12-15; Doc. 36-10). Vestal testified that prior to Plaintiff getting injured, Vestal recommended to the plant manager that Plaintiff be let go. (*Id.*, 47:1-17).

3

Vestal was later informed that Plaintiff was terminated and testified it was his understanding "it was probably because of the job performance, but, I mean, it wasn't my doing, so." (*Id.*, 38:5-17).

Melvin, Vestal, Plaintiff, and Hunt had a meeting on April 19, 2022. (Doc. 36-9, p. 2; Doc. 44-5). Melvin's notes indicate that Vestal stated "performance is not where it needs to be at this time for delaco. Not working nights, per his offer letter that he signed. @ witts end, put words in my mouth, not happy w/ performance." (*Id.*). The notes also show that Plaintiff said "I made arrangements so I working w/ you. Can work nights. Me & James fixed the back door. He went to get parts." (*Id.*). Vestal also completed a "Employee Performance Record" dated April 27, 2022 that notes "attendance/tardiness issues" and "absent, 1 pts. 3.30.22-4.1.22" and "4.23.22- no call/no show 1.5 pts." (Doc. 36-11). Plaintiff was absent March 31 and April 1. (Doc. 36-4, 30:16-18). The time records show that on April 23, 2002, Plaintiff worked from 11:00 p.m. until 2:30 a.m. but was listed as "No Call/No Show" and absent for the remainder 8 hours of the shift. (Doc. 44-5).

### D. Plaintiff's Injury

According to Plaintiff, he strained his right shoulder while unwrapping coils of sheet metal during his May 18, 2022 shift. (DSOF, ¶ 30; PRDSOF ¶ 30). Plaintiff did not report his injury to anyone at Diez before his shift ended, but he called Melvin the morning of May 19 to report his injury. (DSOF, ¶¶ 31, 32; PRDSOF, ¶¶ 31, 32; Doc. 44-2, 38:21-39:7).[3] Melvin instructed Plaintiff to pick up a form authorizing him to seek medical attention at Defendants' occupational healthcare provider, Concentra. (DSOF, ¶ 33; PRDSOF, ¶ 33).

When Plaintiff arrived at the office, she asked him to elaborate on the circumstances of his injury. (DSOF, ¶ 34; PRDSOF, ¶ 34). Specifically, she asked him when he had been injured.

---

[3] Plaintiff stated there was only a "pedestrian supervisor" on the night shift on May 18. (Doc. 36-4, 36:19-21).

4

(DSOF, ¶ 35; PRDSOF, ¶ 35). Melvin testified, and her notes reflect, that there was some discrepancy as to when Plaintiff reported he was injured and that it could have been "recently" or "two or three weeks ago" but Plaintiff denies telling her this. (Doc. 36-6, 28: 9-25; Doc. 36-4, 34:12-23). Melvin testified that she reminded Plaintiff about the company's policy on timely injury reports and then Plaintiff told Melvin he injured his shoulder while working the night before. (Doc. 36-6, 29:7-11, 30:22-25; DSOF, ¶ 39; PRDSOF, ¶ 39).

Plaintiff was diagnosed with "cervical strain," strain of shoulder, right," and "thoracic myofascial strain." (DSOF, ¶ 40; PRDSOF, ¶ 40). The physician's assistant noted Plaintiff could return to work that same day but could not lift more than 10 pounds, push or pull more than 10 pounds, or reach above his shoulder with his right arm. (DSOF, ¶ 41; PRDSOF, ¶ 41). Melvin and Vestal testified that the company did not have any light duty work available, and Vestal testified he did not recall any time that the company had light duty work available. (DSOF, ¶ 44; PRDSOF, ¶ 44). Plaintiff was placed on a leave of absence, and Melvin told him to follow up with his treatments at Concentra. (DSOF, ¶¶ 45, 46; PRDSOF, ¶¶ 45, Doc. 36-15, p. 12).

### E. Plaintiff's Termination

Melvin notified Plaintiff via text message of his termination on May 24, 2022. (DSOF, ¶ 57; PRDSOF, ¶ 57). A Personnel Action Form, dated May 23, 2022, indicated that Plaintiff was terminated because of excessive absenteeism and an unsatisfactory probationary period. (Doc. 36-6, p. 57:13-15, 22-25; 58:1-7; Doc. 36-18). Melvin also noted on the form that Plaintiff "Filed work related injury claiming recently occurred, then claimed it happened a couple weeks earlier. Violation co. standards #21 Pg 46". (Doc. 36-18, p. 2).

Once Plaintiff went to the clinic, Melvin reported his injury to Defendants' workers'

5

compensation insurer, Chubb & Son ("Chubb"). (Doc. 36-6, 56:20-25). In a letter dated May 19, 2022, Chubb confirmed a claim submitted for Plaintiff with a loss date of May 18, 2022. (Doc. 36-19). Chubb promptly processed Plaintiff's claim and paid Plaintiff the equivalent of three weeks of wages. (DSOF, ¶¶ 61, 62; PRDSOF, ¶¶ 61, 62). At some point, Melvin notified Chubb that Plaintiff's employment had been terminated. (PSOF, ¶ 11; DRPSOF, ¶ 11).

Plaintiff's claims arise from a charge of discrimination alleging disability discrimination and retaliation filed both with the Missouri Commission on Human Rights ("MCHR") and the Equal Employment Opportunity Commission ("EEOC") on June 2, 2022. (Doc. 1 ("Complaint"), ¶ 13; Exhibit 1). On November 30, 2022, the EEOC issued Plaintiff a notice of right to sue and on December 30, 2022, the MCHR issued its notice of right to sue. (Complaint Exhibits 2 & 3).

## II. LEGAL STANDARD

Summary judgment should be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "A court considering a motion for summary judgment must view the evidence and inferences that may be reasonably drawn from the evidence in the light most favorable to the nonmoving party." *Dryer v. NFL*, 814 F.3d 938, 941-42 (8th Cir. 2016). "Once the moving party has made and supported their motion, the nonmoving party must proffer admissible evidence demonstrating a genuine dispute as to a material fact." *Holden v. Hirner*, 663 F.3d 336, 340 (8th Cir. 2011). Parties resisting a motion for summary judgment "may not rest on mere allegations or denials, but must set forth specific facts in the record showing that there is a genuine issue for trial." *Dryer*, 814 F.3d at 942 (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 256 (1986)). "Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no genuine issue for trial." *Green Plains Otter Tail, LLC*

6

*v. Pro-Env't., Inc.*, 953 F.3d 541, 545 (8th Cir. 2020). However, summary judgment should not be granted if a reasonable jury could find for the nonmoving party. *Danker v. City of Council Bluffs, Iowa*, 53 F.4th 420, 423 (8th Cir. 2022) (citing *Anderson*, 477 U.S. at 248).

III.     **ANALYSIS**

In his Complaint, Plaintiff brings six[4] counts against Defendant—Count I: Retaliation in Violation of the Missouri Workers' Compensation Law, Mo. Rev. Stat. § 287.780; Count II: Disability Discrimination in Violation of Mo. Rev. Stat. § 213.010, et seq.; Count III: Failure to Accommodate in Violation of Mo. Rev. Stat. § 213.010; Count IV: Retaliation in Violation of the Americans with Disabilities Act of 1990 ("ADA"), as amended by the ADA Amendments Act of 2018 ("ADAAA"), 42 U.S.C. § 12101, et seq.; Count V (Plead in the Alternative): Disability Discrimination in Violation of the ADAAA, 42 U.S.C. § 12101 et seq.; and Count VII (Plead in the Alternative): Failure to Accommodate in Violation of the ADAAA, 42 U.S.C. § 12101 et seq. (Complaint). Defendants argue they are entitled to summary judgment on all counts because: (A) all disability discrimination and failure to accommodate claims (Counts II, III, , and VII) fail because Plaintiff was not disabled; (B) Plaintiff cannot prove he was terminated due to his alleged disability (Counts II and V); (C) Plaintiff's failure to accommodate claims fail because he was accommodated (Counts III and VII); and (D) Plaintiff's retaliatory termination claims (Counts I and IV) fail for the same reasons as his disability discrimination claims. (Doc. 25). The Court addresses each argument below.

A.     **Is Plaintiff disabled? (Counts II, III, V, and VII).**

The Court need not address whether Plaintiff has established a qualifying disability under either the ADA or MHRA because of its findings below.

---

[4] Plaintiff labels his counts as Count I, Count II, Count III, Count IV, Count V and Count VII (a Count VI is omitted). For clarity and consistency, the Court retains these labels.

**B.      Plaintiff cannot prove he was terminated due to disability (Counts II and V).**

Plaintiff alleges he was terminated because of his shoulder injury in Counts II and V. Absent direct evidence of unlawful discrimination, disability discrimination claims are analyzed under the familiar burden-shifting framework set forth in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). *See Anderson v. KAR Global*, 78 F.4th 1031, 1036 (8th Cir. 2023) (ADA); *Oehmke v. Medtronic, Inc.*, 844 F.3d 748, 755-56 (8th Cir. 2016) (employ same burden-shifting analysis to discrimination claims under both the ADA and the MHRA). Under the burden-shifting framework, a plaintiff must first establish a *prima facie* case of discrimination or retaliation. *Olsen v. Cap. Region Med. Ctr.*, 713 F.3d 1149, 1153 (8th Cir. 2013). The *prima facie* case for disability discrimination claims requires a plaintiff to establish "that he (1) has a 'disability' within the meaning of the ADA, (2) is a 'qualified individual' under the ADA, and (3) suffered an adverse employment action as a result of the disability.". *Denson v. Steak 'n Shake, Inc.*, 910 F.3d 368, 370 (8th Cir. 2018) (cleaned up) (quotation omitted).

"The burden then shifts to the employer 'to articulate a legitimate, nondiscriminatory reason for the adverse employment action.'" *Lindeman v. St. Luke's Hosp. of Kansas City*, 899 F.3d 603, 606 (8th Cir. 2018) (quoting *McNary v. Schreiber Foods, Inc.*, 535 F.3d 765, 768 (8th Cir. 2008)). Lastly, "the burden shifts back to the plaintiff to show that the employer's proffered reason is merely a pretext for intentional discrimination." *EEOC v. Prod. Fabricators, Inc.*, 763 F.3d 963, 969 (8th Cir. 2014) (ADA claims); *Murray v. Sw. Mo. Drug Task Force*, 335 S.W.3d 566, 569 n. 7 (Mo. Ct. App. 2011) (evaluating MHRA claims under burden-shifting approach).

Plaintiff has not produced any direct evidence of disability discrimination or retaliation so the Court will apply the burden shifting framework. The Court will presume without deciding that Plaintiff has satisfied his burden of establishing a prima facie case of discrimination. The

8

burden therefore shifts to Defendants to "produc[e] evidence that plaintiff was rejected . . . for a legitimate, nondiscriminatory reason." *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 142 (2000). "Although intermediate evidentiary burdens shift back and forth under this framework, '[t]he ultimate burden of persuading the trier of fact that the defendant intentionally discriminated against the plaintiff remains at all times with the plaintiff.'" *Id.* (citing *Texas Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 253 (1981)).

Defendants have provided ample evidence supporting their contention that Plaintiff was terminated for legitimate, nondiscriminatory reasons. Prior to Plaintiff's injury, his manager had noted unacceptable work performance. Plaintiff failed a test for basic, job-related skills with a 43% score. Plaintiff had also missed at least two days of work and no showed for a shift, which resulted in a write-up for attendance issues. Plaintiff met with his supervisor, another supervisor, and the HR manager to discuss his unacceptable job performance. These instances all occurred during his 90-day probationary period of work.

Further, once the injury did occur, Plaintiff did not follow company policy of reporting the injury prior to the shift ending. Even presuming that Plaintiff reported the injury the following morning, the policy was to report to a supervisor by the end of the shift, which he admittedly did not do. He claimed that he did not have a direct supervisor present at the end of his shift but admitted that there was a plant supervisor on duty at the time. Poor performance, attendance issues, and violating company policy are all legitimate, non-discriminatory rationale for terminating an employee. *See, e.g., Winters v. Deere & Co.*, 63 F.4th 685, 690 (8th Cir. 2023) (performance and attendance issues); *Ebersole v. Novo Nordisk, Inc.*, 758 F.3d 917, 925 (8th Cir. 2014) (violation of company policy); *Henthorn v. Capitol Commc'ns, Inc.*, 359 F.3d 1021, 1029 (8th Cir. 2004) (negative performance review).

Because Defendants have advanced legitimate, nondiscriminatory reasons for terminating Plaintiff, the burden shifts back to Plaintiff to show that these reasons are pretext for intentional discrimination. *Prod. Fabricators*, 763 F.3d at 969. "A plaintiff may show pretext, among other ways, by showing that an employer (1) failed to follow its own policies, (2) treated similarly-situated employees in a disparate manner, or (3) shifted its explanation of the employment decision." *Schaffhauser v. United Parcel Serv., Inc.*, 794 F.3d 899, 904 (8th Cir. 2015) (quotation omitted).

Plaintiff asserts that Defendants' stated reasons for the termination are pretext for disability discrimination because the reasons have shifted over time as well as identification of the decisionmaker. Plaintiff asserts that Defendants first identified Vestal as making the decision to terminate and then identified Hunt as the decisionmaker. The evidence shows that Vestal recommended to Hunt that Plaintiff be terminated. It stands to reason that, because Hunt was Vestal's supervisor, Hunt contacted Melvin in HR with the directive, as is supported by her testimony. But the decisionmaker is largely irrelevant here because, notwithstanding Plaintiff's argument to the contrary, Defendants' reasons for termination were consistent over time. The evidence shows Vestal had issues with Plaintiff's poor performance and that management had a meeting with Plaintiff over his performance issues. And Plaintiff received just a 43% score on the skills test he took. The evidence also supports that Plaintiff was absent 3/30/2022-4/01/2022 and was a no call/no show on 4/23/2022, both instances early in his probationary period. All of this evidence, which occurred prior to Plaintiff's injury, culminated in his termination document noting excessive absenteeism and an unsatisfactory probationary period. Even disregarding his failure to report his injury immediately following his night shift, there is ample evidence in the record to support that Defendants' reasons for termination were legitimate and did not shift over

time.

Plaintiff also argues the temporal proximity of a few days between his injury and his termination supports that his termination was a pretext for discrimination. However, temporal proximity alone cannot raise a question of pretext, and the probative value of such is undercut when performance issues occur prior to the termination. *See, e.g., Corkrean v. Drake Univ.*, 55 F.4th 623, 632 (8th Cir. 2022); *Brown v. Diversified Distrib. Sys., LLC*, 801 F.3d 901, 909 (8th Cir. 2015); *Smith v. Allen Health Sys., Inc.*, 302 F.3d 827, 834 (8th Cir. 2002) ("Evidence that the employer had been concerned about a problem before the employee engaged in the protected activity undercuts the significance of the temporal proximity."). "[T]iming alone is not sufficient to create a genuine issue of fact" when the "proffered reason for termination arose in the same window of time." *Withers v. Johnson*, 763 F.3d 998, 1005 (8th Cir. 2014).

Here, again, there is ample evidence that Defendants had concerns about Plaintiff's work performance and attendance prior to his injury and the proximity of the injury and termination does not establish pretext. Plaintiff has also not shown that Defendants deviated from company policy or that similarly situated employees were treated more leniently. As discussed above, Plaintiff's record shows complaints by his manager of poor performance, a score of 43% on his job skills test, and at least two attendance instances, notably, all during his probationary period. Thus, Plaintiff's termination was justified, and there is insufficient evidence of pretext. For all of these reasons, summary judgment in Defendants' favor on Counts II and V is appropriate.

**C.      Plaintiff's retaliatory termination claims fail for the same reasons (Counts I and IV)**

Plaintiff also alleges that his termination was retaliation for either seeking workers' compensation benefits or for requesting an accommodation under the ADA in Counts I and IV. Although the analysis for workers' compensation retaliation claims and ADA retaliation claims

11

differ, neither claim may proceed based on the facts of this case.

To prove a retaliation claim in the workers' compensation context, an employee must prove that their exercise of rights under the workers' compensation law was the "motivating factor" in their discharge, i.e. that it "actually played a role in the discharge or discrimination and had a determinative influence on the discharge or discrimination." *Ashby v. Woodridge of Mo., Inc.*, 673 S.W.3d 537, 548 (Mo. Ct. App. 2023). "Causation for a retaliation claim under the Workers' Compensation Law requires employees to demonstrate their decision to seek benefits had a 'determinative influence' on the decision to terminate employment." *Id.* Plaintiff has not shown that his decision to seek benefits prompted Defendants to terminate his employment. The evidence establishes Vestal had already recommended termination prior to his injury due to performance and attendance issues. Again, documentation supports Vestal's recommendation. Further, Defendants immediately forwarded Plaintiff's claim to their workers' compensation insurer and Plaintiff was paid benefits of three weeks of wages.[5] Plaintiff received his workers' compensation benefits for his shoulder injury and no one at Defendants challenged his right to claim or receive the benefits. This does not support Plaintiff's workers' compensation retaliation claim.

In order to succeed on an ADA retaliation claim, there must be direct evidence of retaliation or an inference of retaliation must be created under the burden-shifting framework. *Corkrean*, 55 F.4th at 633; *Prod. Fabricators*, 763 F.3d at 972. As discussed *supra*, Defendants have provided legitimate, non-discriminatory reasons for Plaintiff's termination, Plaintiff cannot show that those reasons are mere pretext. For all of these reasons and those discussed *supra*, summary judgment in Defendants' favor on Counts I and IV is appropriate.

---

[5] Melvin's notes indicate that a vice-president directed her to deny Plaintiff's claim but that is irrelevant because she did not act on that directive and, as discussed, promptly forwarded the injury claim to Chubb.

**D. Plaintiff's failure to accommodate claims fail (Counts III and VII)**

Plaintiff asserts that Defendants failed to accommodate his disability and alleges that, instead of allowing Plaintiff to work light duty or take time off work while light duty work was unavailable, Defendants terminated his employment. (Complaint). To show an employer failed to provide accommodation, the employee must show:

> (1) the employer knew about the employee's disability; (2) the employee requested accommodations or assistance for his disability; (3) the employer did not make a good faith effort to assist the employee in seeking accommodations; and (4) the employee could have been reasonably accommodated but for the employer's lack of good faith.

*Prod. Fabricators*, 763 F.3d at 971; *see also Mobley v. St. Luke's Health Sys., Inc.*, 53 F.4th 452, 457 (8th Cir. 2022); *Garrison v. Dolgencorp, LLC*, 939 F.3d 937, 941 (8th Cir. 2019).

First, Plaintiff's own testimony defeats his failure to accommodate claims. Plaintiff testified that he never requested any accommodation. (Doc. 36-4, 61:3-9). Consequently, Plaintiff cannot establish the prima facie case. *See Walz v. Ameriprise Fin., Inc.*, 779 F.3d 842, 847 (8th Cir. 2015) (failure to accommodate claim fails to raise genuine issue of material fact because employee never requested an accommodation); *Prod. Fabricators*, 763 F.3d at 971 (failure to request accommodation supports summary judgment).

But even if Plaintiff had requested an accommodation, or him giving Melvin his clinical report recommending modified work could be viewed as a request, Defendants did accommodate Plaintiff by placing him on leave of absence while he had work restrictions. Plaintiff testified that he could only work with light duty accommodation and that no light duty work was available at that time. (Doc. 36-4, 60:9-25). Vestal and Melvin also testified that there was no light duty work available for Plaintiff's position. (Doc. 36-2, 35:20-22; Doc. 36-6, 35:13-15). Plaintiff has presented no evidence that there was light duty work available to meet his

13

restrictions. Plaintiff is entitled only to a reasonable accommodation, and leave can be a reasonable accommodation when no jobs are available that meet a plaintiff's limitations. *See, e.g., Brannon v. Luco Mop Co.*, 521 F.3d 843, 849 (8th Cir. 2008) (medical leave of absence can be a reasonable accommodation); *Jackson v. General Motors, LLC*, No. 4:18-CV-1243 RLW, 2020 WL 3469334, at *26-27 (E.D. Mo. June 25, 2020) (finding leave can be a reasonable accommodation when no jobs existed in the plant that met plaintiff's limitations). Plaintiff and Melvin both testified that Plaintiff was placed on leave of absence once he was diagnosed and put on modified work restrictions.

Plaintiff has failed to establish that Defendants failed to accommodate his limitations. Thus, Defendants are entitled to summary judgment on Plaintiff's failure to accommodate Claims III and VII.

## CONCLUSION

Plaintiff's termination was justified with legitimate, non-discriminatory reasons that occurred prior to his injury. He had performance and attendance issues while on the 90-day probationary work period. Defendants accommodated Plaintiff's work limitations by placing him on leave of absence. For these reasons and the reasons discussed above, Defendants' Motion for Summary Judgment on Counts I, II, III, IV, V and VII is GRANTED.

**IT IS SO ORDERED.**

s/ Gary A. Fenner<br>
GARY A. FENNER, JUDGE<br>
UNITED STATES DISTRICT COURT

DATED: May 7, 2024